IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| CAROLYN ROSEMARY ESPINA STANTON, | ) ) ) | CV. NO. 09-00404 DAE-LEK |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO COUNTRYWIDE BANK, N.A., LOAN NETWORK LLC, FIDELITY NATIONAL TITLE & ESCROW OF HAWAII, INC., JOHN DOES 1-10, JANE DOES 1-10, and DOE CORPORATIONS, PARTNERSHIPS AND OTHER ENTITIES 1-10, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. _____ | ) ) ) | |

AMENDED ORDER GRANTING IN PART WITH AND WITHOUT
PREJUDICE AND DENYING IN PART DEFENDANT FIDELITY NATIONAL
TITLE & ESCROW OF HAWAII'S MOTION FOR SUMMARY JUDGMENT

Upon further review of the record, the Court elects to amend its

original order, filed July 30, 2010.  The Court's amended order does not change the

Court's original holding and is provided for clarification purposes only.

On July 12, 2010, the Court heard Defendant Fidelity National Title &

Escrow of Hawaii's Motion for Summary Judgment.  (Doc. # 31.)  Colin A. Yost,

Esq., appeared at the hearing on behalf of Plaintiff; Jade L. Ching, Esq., appeared

at the hearing on behalf of Defendant Fidelity National Title & Escrow of Hawaii;

Patricia J. McHenry, Esq., appeared at the hearing on behalf of Defendant Bank of

America, N.A.  After reviewing the motion and the supporting and opposing

memoranda, the Court **GRANTS IN PART WITH AND WITHOUT**

**PREJUDICE AND DENIES IN PART** Defendant's Motion.  (Doc. # 31.)

<u>BACKGROUND</u>

I.      <u>The Transaction</u>

Plaintiff alleges that she purchased the property located at 5404 Poola

Street, Honolulu, Hawai`i 96821 (the "Property") in 2003.  ("Compl." ¶ 18, Doc. #

26.)   In late 2006, Plaintiff states that she discussed refinancing the Property with

the mortgage broker for the transaction, Defendant Loan Network LLC ("Loan

Network") in order to "obtain cash for house upgrades and improvements."  (<u>Id.</u> ¶¶

18-19.)  The lender for the transaction was Defendant Bank of America, N.A.,

successor by merger to Countrywide Bank, N.A. ("Countrywide").  (<u>Id.</u> ¶¶ 8, 24-

25.)   Pursuant to written instructions from the parties, and specifically the

instructions between Plaintiff and Defendant Fidelity National Title & Escrow of

Hawaii, Inc. ("Fidelity Escrow" or "Defendant"), Fidelity Escrow served as the

escrow depository for the refinancing loan transaction.  (<u>Id.</u> ¶ 29; Doc. # 32,

Declaration of Dot Yoza, "Yoza Decl." ¶ 3 & Ex. D.)  The escrow instructions

signed and accepted by Plaintiff (the "Escrow Instructions") provide, <u>inter</u> <u>alia</u>,

that:

> [Fidelity Escrow] serves ONLY as an Escrow Holder in connection
> with these instructions and cannot give legal advice to any party
> hereto.
>
> Escrow Holder is not to be accountable or liable for the sufficiency or
> correctness as to form, manner of execution, or validity of any
> instrument deposited in this escrow, nor as to the identity, authority or
> rights of any person executing the same. Escrow Holder's duties
> hereunder shall be limited to the proper handling of such money and
> the proper safekeeping of such instruments, or other documents
> received by Escrow Holder, and for the disposition of same in
> accordance with the written instructions accepted by Escrow Holder.

(Yoza Decl., Ex. D ¶ 19.)

As alleged by Plaintiff, the principal amount of the first loan was

$1,500,000.00.  (Compl. ¶ 37.)  The first loan is evidenced by a mortgage dated

February 1, 2007 and recorded February 12, 2007, in the Office of the Assistant

Registrar of the Land Court of the State of Hawai`i ("Land Court") as Document

No. 3558893 (the "First Mortgage").  (<u>Id.</u>; Doc. # 32, Declaration of Moritz

"Moritz Decl.," Ex. B.)  The principal amount of the second loan was $215,000.00,

and the second loan is evidenced by a mortgage dated February 1, 2007 and

recorded February 12, 2007, in the Land Court as Document No. 3558894 (the

"Second Mortgage") (collectively, the First Mortgage and Second are hereinafter the "Loan").  (Compl. ¶ 49; Moritz Decl., Ex. C.)  Plaintiff states that she signed the relevant Loan documents at Fidelity Escrow's offices and did not read them. (Compl. ¶¶ 31, 32, 34, 46.)  Plaintiff refinanced her Property with the two loans and obtained over $330,000 in cash.  (Id., Exs. E, F.)

II.    The Litigation

Plaintiff initiated this action on August 27, 2009, by filing a complaint in this Court.  (Doc. # 1.)  On April 12, 2010, pursuant to a stipulation among the parties (Doc. # 25), Plaintiff filed her First Amended Complaint (the "Complaint"). ("Compl.," Doc. # 26.)  The claims alleged against Fidelity Escrow  in the Complaint include: Unfair or Deceptive Acts or Practices in violation of Hawai`i Revised Statutes ("HRS") §§ 480-2(a) and/or 481A-3 (Count VIII); Conspiring with Countrywide and Loan Network to defraud Plaintiff (Count XI); Aiding and abetting Countrywide and/or Loan Network in their wrongful acts including violations of the Credit Repair Organizations Act ("CROA") 15 U.S.C. § 1679, HRS § 480 et seq., and fraud actions (Count XII); Negligence (Count XIII); and Breach of Fiduciary Duty pursuant to HRS § 449-16 (Count XIV).  (See Compl.)

On May 5, 2010, Defendant Fidelity Escrow filed the instant Motion for Summary Judgment ("Motion").  ("Mot.," Doc. # 31.)  The same day, Fidelity

4

Escrow also filed its Concise Statement in Support.  ("DCSF," Doc. # 32.)  On

June 21, 2010, Plaintiff filed her Opposition to Defendant's Motion.  ("Opp'n,"

Doc. # 37.)  The same day, Plaintiff additionally filed her Concise Statement of

Facts in Opposition.  ("PCSF," Doc. # 36.)  On June 28, 2010, Defendant filed its

Reply in support of its Motion.  ("Reply," Doc. # 38.)

<u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56 requires summary judgment to be

granted when "the pleadings, the discovery and disclosure materials on file, and

any affidavits show that there is no genuine issue as to any material fact and that

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u>

<u>also</u> <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005); <u>Addisu v.</u>

<u>Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of

summary judgment is to dispose of factually unsupported claims and defenses.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  <u>See</u> <u>id.</u> at

323.  A moving party without the ultimate burden of persuasion at trial—usually,

but not always, the defendant—has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment.  <u>Nissan Fire &</u>

5

Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden

initially falls upon the moving party to identify for the court those "portions of the

materials on file that it believes demonstrate the absence of any genuine issue of

material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d

626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

        Once the moving party has carried its burden under Rule 56, the

nonmoving party "must set forth specific facts showing that there is a genuine

issue for trial" and may not rely on the mere allegations in the pleadings.  Porter,

419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)).  In setting forth "specific facts," the nonmoving party may not meet its

burden on a summary judgment motion by making general references to evidence

without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885,

889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary

judgment, the court shall have no independent duty to search and consider any part

of the court record not otherwise referenced in the separate concise statements of

the parties.").  "[A]t least some 'significant probative evidence'" must be

produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v.

Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence

that is merely colorable or not significantly probative does not present a genuine

issue of material fact." <u>Addisu</u>, 198 F.3d at 1134.  Further, the Ninth Circuit has

"refused to find a 'genuine issue' where the only evidence presented is

'uncorroborated and self-serving' testimony." <u>Villiarimo v. Aloha Island Air, Inc.</u>,

281 F.3d 1054, 1061 (9th Cir. 2002) (citing <u>Kennedy v. Applause, Inc.</u>, 90 F.3d

1477, 1481 (9th Cir. 1996).  "Conclusory allegations unsupported by factual data

cannot defeat summary judgment." <u>Rivera v. Nat'l R.R. Passenger Corp.</u>, 331 F.3d

1074, 1078 (9th Cir. 2003).

When "direct evidence" produced by the moving party conflicts with

"direct evidence" produced by the party opposing summary judgment, "the judge

must assume the truth of the evidence set forth by the nonmoving party with

respect to that fact." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  In other words, evidence

and inferences must be construed in the light most favorable to the nonmoving

party. <u>Porter</u>, 419 F.3d at 891.  The court does not make credibility determinations

or weigh conflicting evidence at the summary judgment stage.  <u>Id.</u>; <u>see also</u> <u>Nelson</u>

<u>v. City of Davis</u>, 571 F.3d 924 (9th Cir. 2009) ("[C]redibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts

are jury functions, not those of a judge.") (citations omitted).  However, inferences

may be drawn from underlying facts not in dispute, as well as from disputed facts

that the judge is required to resolve in favor of the nonmoving party.  T.W. Elec.

Serv., 809 F.2d at 631.

DISCUSSION

I.    General Escrow Law

        In Hawai`i, escrow depositories are governed by HRS Chapter 449,

the Escrow Depositories Statute.  An "escrow depository" is defined as "the

corporation which, in an escrow, and for compensation, receives, holds, and

delivers the money, other consideration, or instrument affecting title to real

property."  HRS § 449-1 ("Escrow depository").  HRS § 449-16 states that a

licensed escrow "shall have the responsibility of a trustee for all moneys, other

consideration, or instruments received by it."  In Hawai`i, the "[g]eneral rule is that

escrow depository occupies fiduciary relationship with parties to escrow agreement

or instructions and must comply strictly with the provisions of such agreement or

instructions."  DeMello v. Home Escrow, 659 P.2d 759, 763 (Haw. App. 1983)

(citation omitted).  As the DeMello Court explained:

> [t]he legislators sought to license and regulate those setting
> themselves up in an escrow business handling substantial sums of
> money and assuming a large measure of fiduciary responsibility to the
> parties to real property transactions.

8

Id. (citing Senate Stand. Comm. Rep. No. 599, 4th Hawaii Leg., Gen. Sess.,

reprinted in Senate Journal 1118 (1967)) (internal quotations omitted).

However, the DeMello court determined that "[t]he statutory

definition of 'escrow' specifically limits the depository's function to acts

performed 'in accordance with the terms of the agreement between the parties to

the transaction.'" Id. at 763.  Accordingly, an escrow has no duty to "police" a

transaction for the parties:

> [A]n escrow holder has no general duty to police the affairs of its
> depositors; rather, an escrow holder's obligations are limited to
> faithful compliance with [the depositors'] instructions.

Summit Financial Holdings, Ltd. v. Continental Lawyers Title, Co., 27 Cal. 4th

705, 711 (2002) (quotation and internal marks omitted).  Fidelity Escrow may limit

its duties in the Escrow Instructions so long as any limitations provided in such

instructions are not in contravention of statutory inhibitions or public policy.  See

generally Liberty Mut. Ins. Co. v. Sentinel Ins. Co., Ltd., 205 P.3d 596, 614-615

(Haw. App. 2009) ("Liability insurers have the same rights as individuals to limit

their liability, and to impose whatever conditions they please on their obligation,

provided they are not in contravention of statutory inhibitions or public policy.")

In regards to escrow liability, the Hawai`i Supreme Court has found that where a party to a transaction in which an escrow is utilized engages in fraudulent activity, an escrow is not liable when it acts in good faith and does not have actual knowledge of wrongdoing.  Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc., 751 P.2d 77, 78 (Haw. 1988).

Bishop involved the actions of Ronald Ray Rewald, chairman of the board of directors of Bishop, Baldwin Rewald, Dillingham & Wong, Inc., who was operating a pyramid scheme and purchased a home during that scheme with company money.  Id. at 78-79.  Rewald drew checks from the company's bank account and transmitted them to the Bank of Hawai`i, which then placed the money into a real estate collection account and then credited the money into the checking account of the seller of the home.  Id. at 79.  The Ninth Circuit certified to the Hawai`i Supreme Court the question of whether the Bank of Hawai`i, acting as an "escrow agent," was liable under the Uniform Fiduciaries Act, HRS Chapter 556-7 (deposit in name of principal), when it "transferred []funds in good faith and did not know that [Rewald] took the funds in violation of his fiduciary duties, but did know that the funds were for his personal use[.]"  Id. at 78.  The Bishop court examined the duties of a depository under the uniform act, from which HRS

10

Chapter 556 was derived, and held that sections 7, 8, and 9 of the uniform act were

intended

> to lay down a definite rule, making the bank, where it acts solely as a depository, liable only if it has actual knowledge of the fiduciary's breach of duty or if it acts in bad faith[.]

Id. at 81 (citing 7A Uniform Laws Annotated, at 418). The Bishop court held that:

> [w]here evidence is lacking that a bank received checks drawn by a fiduciary as his personal creditor, or that it transferred funds received with actual knowledge of the fiduciary's breach of his obligation as fiduciary, or that the transfers were made in bad faith, HRS §§ 556-4 and 556-8 do not render the bank liable to the principal.

Id. (citation omitted).

Therefore, Fidelity Escrow may meet its obligation to Plaintiff by: 1)

acting in good faith; 2) with no knowledge of wrongdoing on the parties to the

transaction; and 3) complying with all escrow instructions.  DeMello, 659 P.2d at

763; Bishop, 751 P.2d at 81.

II.    Counts Alleged Against Fidelity Escrow

A.    Negligence (Count XIII)

In her claim for negligence (Count XIII), Plaintiff alleges that Fidelity

Escrow had a duty to protect the parties "against unreasonable risks relating to

11

money and other consideration and instruments affecting title to real property."[1]

(Compl. ¶ 190.)  In its Motion, Fidelity Escrow relies on applicable case law as

summarized above and the Escrow Instructions, which specifically disclaim any

obligation to give legal advice (Yoza Decl., Ex. D, ¶ 19), in arguing that it owed no

such duty to either party.  (See Mot. at 7-13.)  In opposition, Plaintiff offers no

argument regarding her claim that Fidelity Escrow negligently failed to "protect"

her in the Loan Transaction (see Opp'n at 11-12) and instead discusses only why

Fidelity Escrow breached its fiduciary duties in an apparent effort to combine these

arguments.  (Id. at 12-16.)  Plaintiff's claim regarding fiduciary duty is discussed

below.

Under Hawai`i law, the elements of a cause of action for negligence

are:

> 1. A duty, or obligation, recognized by the law, requiring the
> [defendant] to conform to a certain standard of conduct, for the
> protection of others against unreasonable risks[;] 2. A failure on the
> [defendant's] part to conform to the standard required: a breach of the
> duty . . . [;] 3. A reasonably close causal connection between the
> conduct and the resulting injury . . . . [and] 4. Actual loss or damage
> resulting to the interests of another . . . .

---

[1] In claiming negligence, Plaintiff does not allege Fidelity Escrow had any knowledge of wrongdoing.

12

Knodle v. Waikiki Gateway Hotel, Inc., 742 P.2d 377, 385 (Haw. 1987) (citation omitted, brackets in original).  "[I]t is fundamental that a negligence action lies only where there is a duty owed by the defendant to the plaintiff."  Bidar v. Amfac, Inc., 669 P.2d 154, 158 (Haw. 1983).  Duty is a question of law for the courts to resolve.  Knodle, 742 P.2d at 383; Pickering v. State, 557 P.2d 125, 127 (Haw. 1976) (a court must consider the question of negligence and proximate cause as a matter of law where there is no dispute in the evidence before the court) (citation omitted).

As demonstrated above, HRS Chapter 449 and case law hold that Fidelity Escrow was not tasked with "policing" the Loan transaction or protecting the parties to the transaction from fraud.  "The statutory definition of 'escrow' specifically limits the depository's function to acts performed 'in accordance with the terms of the agreement between the parties to the transaction.'"  DeMello, 4659 P.2d at 763.  Moreover, the express language of the Escrow Instructions, agreed to by Plaintiff, demonstrate that such a duty was not provided contractually.  In fact, such a duty was specifically disclaimed.  (Yoza Decl., Ex. D ¶ 19.)  Due to the specific nature of an escrow's duties as provided under Hawai`i law, the Court finds that Fidelity Escrow did not have a duty to "protect" the parties "against unreasonable risks relating to money and other consideration and instruments

13

affecting title to real property[,]" which is the limited claim set forth in Plaintiff's cause of action for negligence.  Accordingly, the Court **GRANTS** Fidelity Escrow's Motion as to Count XIII.

B.    Breach of Fiduciary Duty (Count XIV)

As to Plaintiff's claim for breach of fiduciary duty, Plaintiff complains that Fidelity Escrow breached its fiduciary duty by "among other things, failing to provide an accurate and fully informative settlement statement." (Compl. ¶ 200.)  In her Opposition, Plaintiff restates this proposition in multiple parts as Fidelity Escrow's failure to: 1) provide the Loan documents at signing as per the requirements of the Real Estate Settlement Procedures Act ("RESPA"); 2) prepare the HUD settlement statement as required by RESPA; and 3) advise Plaintiff regarding "inter alia, mortgage broker fees, inconsistent and fluctuating interest rates and the provision of estimated HUD statements."  (Opp'n at 12-16.)

First, Plaintiff's Complaint alleges that Fidelity Escrow breached its fiduciary duty to Plaintiff by failing to provide the Loan documents at closing.[2] Plaintiff supports her claim by referencing a contractual requirement provided by

---

[2] Fidelity Escrow disputes that the documents were not provided to Plaintiff. For the purposes of summary judgment, the Court treats the Plaintiff's controverted factual allegations as true.

the Lender's Closing Instructions.[3]  (PCSF, Ex. 7.)  Fidelity Escrow argues that, as

to any contractual duty, it is the Escrow Instructions between Plaintiff and Fidelity

Escrow, not the Lender's unilateral Closing Instructions,[4] that control the duties of

Fidelity Escrow to Plaintiff in this instance.

        "It is a commonly-accepted axiom that a holder of third-party

beneficiary status may not avoid otherwise enforceable contract provisions."  Sher

v. Cella, 160 P.3d 1250, 1256-57 (Haw. App. 2007) (citing Intergen N.V. v. Grina,

344 F.3d 134, 146 (1st Cir. 2003)).  Conversely, the holder of such a status may

---

[3]  Fidelity Escrow also argues pursuant to Federal Rule Civil Procedure
56(e)(1) that the Lender's Closing Instructions (PCSF, Ex. 7), as well as all of
Plaintiff's other exhibits (PCSF, Ex. 4-13), are not properly before this Court
because Plaintiff's counsel attempted to authenticate the documents when he has
no personal knowledge regarding the documents' authenticity.  (Reply at 7 n.6,
13.) Plaintiff's counsel declares that such documents were produced pursuant to
Federal Rule Civil Procedure 26(a).  (Yost Decl. ¶¶ 2-11.)  Due to the fact that
Fidelity Escrow does not contest the exhibits' authenticity or that the documents
were in fact produced by Fidelity Escrow, it is within the Court's discretion to
consider them.  See Fed. R. Evid. 901(b)(4) (evidence may be authenticated by
examining its "[a]ppearance, contents, substance, internal patterns, or other
distinctive characteristics, taken in conjunction with circumstances.")

[4] It is not clear to the Court whether the Lender's Closing Instructions
submitted by Plaintiff were accepted by Fidelity Escrow as only the page providing
the quoted language was submitted to the Court.  However, due to the fact that the
document's authenticity was not objected to and, again, the document was
provided by Fidelity Escrow pursuant to Federal Rule Civil Procedure 26(a), the
document has sufficient indicia of reliability and the Court takes all facts in the
light most favorable to the Plaintiff as the non-moving party.  See Fed. R. Evid.
901(b)(4).

also sue to enforce contract provisions for which they are intended to benefit.  See

Trans-Bay Eng'rs & Builders, Inc. v. Hills, 551 F.2d 370, 378 (D.C. Cir. 1976).

        The law requires a "special clarity" in determining whether Plaintiff is

a third-party beneficiary to the Lender's Closing Instructions as accepted by

Fidelity Escrow.  Id.  Review of the Lender's Closing Instructions, specifically the

instruction at issue regarding the provision of Loan documents to Plaintiff at

signing (PCSF, Ex. 7 ¶ 10), reveals that Plaintiff, as a non-signatory third party,

was explicitly named in the contract as the "Borrower" and that the signatories to

the instructions intended to confer a benefit on Plaintiff as the Borrower.  See

Sher,160 P.3d at 1256-57 (citing E.I. DuPont de Nemours & Co. v. Rhone Poulenc

Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 196-97 (3rd Cir. 2001) ("[A]

third [-]party beneficiary will only be bound by the terms of the underlying

contract where the claims asserted by that beneficiary arise from its third[-]party

beneficiary status."); McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994)).

        Further, the Lender's Closing Instructions satisfy the three-part test

described in E.I. DuPont de Nemours, and cited by the court in Sher, in that the

lender, Countrywide, and Fidelity Escrow intended that Plaintiff benefit from the

agreement (in the form of facilitating Plaintiff's refinancing), the benefit was

intended in satisfaction of a pre-existing obligation to that party (see 15 U.S.C.

16

§ 1638(b)(2)(B)(ii) (disclosures shall "be provided in the form of final disclosures at the time of consummation of the transaction, in the form and manner prescribed by this section[]"), and the intent to confer the benefit was a material part of the parties' purpose in entering into the agreement (there would be no escrow without the Loan between Countrywide and Plaintiff).  Id.; see also Guardian Constr. Co. v. Tetra Tech Richardson, Inc., 583 A.2d 1378, 1386 (Del. Sup. 1990) ("In order for third-party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third-party, whether it be creditor or donee, should be a material part of the contract's purpose.").  Thus, Plaintiff can be considered third-party beneficiary to that agreement.  This conclusion does not distort the manifest intentions of the contracting parties or reach conclusions contrary to the clear language of the agreement.  Equal Employment Opportunity Comm'n v. Waffle House, Inc., 534 U.S. 279, 294 (2002).  Accordingly, Fidelity Escrow owed a duty to Plaintiff to provide her the Loan documents at closing pursuant to the Lender's Closing Instructions.

Plaintiff also alleges that Fidelity Escrow's failure to provide the Loan documents at closing violates RESPA and its enabling regulations.  12 U.S.C. § 2601 et seq; 24 C.F.R. § 3500, App. A (Instructions for Completing HUD-1 and

17

HUD-1a Settlement Statements "Appendix A"). (Opp'n at 12.) Plaintiff makes

this claim in an apparent effort to support her breach of fiduciary duty claim, not as

to allege a separate violation of RESPA.[5]

Section 4 of RESPA requires that settlement[6] agents use a uniform

standard settlement form provided by the United States Department of Housing

and Urban Development ("HUD") in order to, inter alia, "conspicuously and

---

[5] All of Plaintiff's allegations regarding breach of fiduciary duty that Plaintiff claims are violations of RESPA seem to be grounded in sections 2603 and 2604 of RESPA. No private cause of action is provided for under 12 U.S.C. § 2603 or 24 C.F.R. § 3500.10. See Martinez v. Wells Fargo Home Mortg., Inc., 598 F.3d 549, 557 (9th Cir. 2010); Bloom v. Martin, 865 F. Supp. 1377, 1384 (N.D. Cal. 1994) (finding that Congress did not intend to create a private right of action for violations of Section 2603), aff'd, 77 F.3d 318 (1996); Collins v. FMHA-USDA, 105 F.3d 1366, 1368 (11th Cir. 1997) ("[T]here is no private civil action for a violation of 12 U.S.C. § 2604(c), or any regulations relating to it."). Moreover, "RESPA provides for a private right of action for claims brought under sections 2605, 2507 and 2608 only." Brittain v. Indymac Bank, FSB, 2009 WL 2997394 at *2 (N.D. Cal. Sept. 16, 2009). Neither sections 2605, 2607 or 2608 pertain to alleged inaccuracies on RESPA-mandated forms, disclosure requirements at closing nor do they pertain to disclosures regarding the contents of the loans provided, and courts have refused to infer a private right of action under other sections of RESPA. Id. To the extent Fidelity Escrow's alleged actions violate any other statute, such as the Truth in Lending Act ("TILA"), 15 U.S.C. § 1635 and 12 C.F.R. § 226.23(a)(3), Plaintiff did not state such a claim against Fidelity Escrow in her Complaint.

[6] "'Settlement' means the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan. This process may also be called 'closing' or 'escrow' in different jurisdictions." 24 C.F.R. § 3500.2(b).

clearly itemize all charges imposed upon the borrower."  12 U.S.C. § 2603.

Although neither party cites to specific statutory authority, RESPA regulations require Fidelity Escrow to provide the Loan documents at closing.  Preliminarily, the regulations to RESPA provide that

> The settlement agent shall use the HUD-1 settlement statement in every settlement involving a federally related mortgage loan in which there is a borrower and a seller. For transactions in which there is a borrower and no seller, such as refinancing loans or subordinate lien loans, the HUD-1 may be utilized by using the borrower's side of the HUD-1 statement.

24 C.F.R. § 3500.8.   RESPA regulation 24 § 3500.8 also provides that "[t]he settlement agent shall complete the HUD-1 or HUD-1A, in accordance with the instructions set forth in Appendix A to this part."  The same regulation further provides that

> A violation of any of the requirements of this section will be deemed to be a violation of section 4 of RESPA. An inadvertent or technical error in completing the HUD-1 or HUD-1A shall not be deemed a violation of section 4 of RESPA if a revised HUD-1 or HUD-1A is provided in accordance with the requirements of this section within 30 calendar days after settlement.

24 C.F.R. § 3500.8.  Important to Fidelity Escrow's alleged failure to provide the Loan documents, the regulations to RESPA also provide that

> [t]he settlement agent shall provide a completed HUD-1 or HUD-1A to the borrower, the seller (if there is one), the lender (if the lender is not the settlement agent), and/or their agents. When the borrower's

19

and seller's copies of the HUD-1 or HUD-1A differ as permitted by
the instructions in Appendix A to this part, both copies shall be
provided to the lender (if the lender is not the settlement agent). The
settlement agent shall deliver the completed HUD-1 or HUD-1A at or
before the settlement, except as provided in paragraphs (c) and (d) of
this section.

24 C.F.R. § 3500.10(b).  Paragraph (c) provides an exception if the borrower

executes "a written waiver at or before settlement."  24 C.F.R. § 3500.10(c).

Paragraph (d) provides an exception when "the borrower or the borrower's agent

does not attend the settlement, or when the settlement agent does not conduct a

meeting of the parties for that purpose."[7]  24 C.F.R. § 3500.10(c).  Therefore,

RESPA provides support for Fidelity Escrow's obligation to Plaintiff to produce

the Loan documents at signing.  Accordingly, as to Fidelity Escrow's alleged

failure to provide Plaintiff with the Loan documents, the Court finds that taking all

facts in the light most favorable to the Plaintiff, this act could be considered a

breach of Fidelity Escrow's fiduciary duties to Plaintiff.

Fidelity Escrow argues that Plaintiff cannot show that she would have

rescinded the Loan prior to the expiration of the three-day period provided by

---

[7] Additionally, 24 C.F.R. § 3500.10 provides that "[t]he settlement agent
shall permit the borrower to inspect the HUD-1 or HUD-1A settlement statement,
completed to set forth those items that are known to the settlement agent at the time
of inspection, during the business day immediately preceding settlement."  It is not
asserted, however, that such a request was made by Plaintiff.

TILA[8] had she received the Loan documents at signing, and therefore, Plaintiff

cannot show that Fidelity Escrow's actions caused her damage.  In support,

Fidelity Escrow states that the fact that Plaintiff does not dispute that copies of the

fully executed Loan documents were made available to her on approximately

February 12th or 13th, 2007 or that Plaintiff noticed the alleged discrepancy in

terms not long after she picked up the documents (DCSF, Declaration of Carolyn

Stanton "Stanton Decl." ¶¶ 21, 22) is inconsistent with Plaintiff's argument that

had she been " . . . provided the loan documents . . . on February 1, 2007, [she]

would have rescinded the transaction on or before February 5, 2007[]" (id. ¶ 30).

        As detailed above, Plaintiff signed the Loan on February 1, 2007.  The

Loan recorded on February 12, 2007.  Plaintiff states that "as soon as" the alleged

discrepancy in the Loan rates and other Loan terms was discovered, Plaintiff

attempted to call her broker at Loan Network but Plaintiff's calls were never

returned.  (Id. ¶ 28.)  However, it seems from the facts before the Court that, as

Fidelity Escrow alleges, Plaintiff waited over two years before initiating any

adverse action or formally objecting to the $330,000 cash Loan.  (See Compl. ¶¶

---

        [8] Under TILA, if a loan is secured by a debtor's primary residence, "the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms . . . whichever is later." 15 U.S.C. 1635(a).

21

72-76.)  Plaintiff argues that throughout this period of time Plaintiff was attempting to negotiate new terms of the Loan with Countrywide.

Nonetheless, the Court finds that contrary to Fidelity Escrow's argument, Plaintiff's actions after the Loan was completed are not necessarily indicative of what Plaintiff may have decided if provided the opportunity to review the Loan documents at closing or prior to February 5, 2007.[9]  Plaintiff has

_____

[9] In making this determination, the Court does not decide when Plaintiff's right to rescind expired and cannot do so with the limited information before it. However, the claims levied by Plaintiff against Fidelity do not concern whether as a matter of law Plaintiff could have rescinded, but instead Plaintiff's claims involve whether Plaintiff would have rescinded if not for Fidelity's breach of duty. Accordingly, a determination of when Plaintiff's right to rescind expired is not before this Court and an inquiry into the date Plaintiff's right to rescind expired is not warranted at this juncture.

Moreover, the Court notes in clarification that it has considered the possibility that the delivery of the Loan documents on or after February 12, 2007 provided Plaintiff with a TILA rescission date later than that of February 5, 2007. The Court finds that from the evidence currently before the it, even if Plaintiff's right to rescind expired three days after she received the Loan documents, Fidelity's failure to timely provide Plaintiff with the Loan documents at closing still may have caused Plaintiff to fail to rescind the Loan because through Fidelity Escrow Officer Dot Yoza ("Yoza"), Fidelity clearly and unequivocally informed Plaintiff in an email on February 5, 2007 that her right to rescind would expire on February 5, 2007 based on the signing of the mortgage documents on February 1, 2007.  (See PCSF, Ex. 3.) Yoza's email states in full:

Carolyn and Tim - FYI: your mortgage broker has not delivered the signed mortgage documents to my office as of 3:33 p.m. today.  The right of rescission will expire 12 midnight 02/05/07 - based on Carolyn's signing of the documents on Thursday 02/01/07.

(continued...)

22

plausibly alleged causation and damages, i.e., that Fidelity Escrow's failure to

provide Plaintiff with the documents caused Plaintiff to enter into the Loan on

differing terms from those anticipated.  Therefore, a genuine issue of material fact

remains as to whether Plaintiff would have rescinded the Loan if she had been

provided the Loan documents as contractually required.

       The rest of Plaintiff's factual allegations regarding breach of fiduciary

duty involve Fidelity Escrow's alleged failures to properly prepare the disclosures

---

[9](...continued)

    If all funding conditions have been met, the transaction should fund
tomorrow 02/06/07.  However, Fidelity will not be able to set up the
recording until 2 business days from receipt of the documents.  Per my
telephone discussion with Robin this morning - she will deliver the
documents when the notary public has completed the
acknowledgment.

    Thank you[.]

(Id.) Fidelity's affirmative statement regarding the date of rescission separates this
case from one in which the right of rescission was merely provided by a notice of
right to rescind that accompanied the loan documentation. Yoza's email provides
Plaintiff an additional factual basis—not raised by Plaintiff in her Complaint or
Opposition—on which to support her claims against Fidelity, as explained further
in this Court's Order denying Fidelity Escrow's Motion for Reconsideration.
(Doc. # 52.)  Accordingly, a genuine issue of material fact remains as to whether
Plaintiff would have rescinded the loan if she had been provided the Loan
documents at closing, especially in light of Fidelity's affirmative statement
regarding Plaintiff's right to rescind.

on the final HUD-1 and its preparation of a "combined" written HUD-1 settlement statement instead of separating out the statements for the First and Second Mortgages.  (Opp'n at 12-15.)  These additional allegations involve the actual manner in which the HUD-1 was completed in a way that Plaintiff argues failed to comply with RESPA Appendix A.  Plaintiff does not argue that complete information was not provided by Fidelity Escrow, but instead argues that the Loan information was improperly inputted into the HUD-1 settlement statement.

Plaintiff alleges that under RESPA, Fidelity Escrow failed to comply with Appendix A in filling out the HUD-1.  Fidelity Escrow rebuts such allegations by stating that RESPA does not provide such clear authority, or any authority at all.  However, the Court need not determine if the alleged failures constitute a breach of fiduciary duty.  Instead, the Court finds that Plaintiff offers no explanation regarding how the alleged errors caused her to enter into the Loan with different terms than she had anticipated, which is Plaintiff's only stated cause of action for damages.  This is especially true because Plaintiff explicitly states that she only received the signature page of the HUD form at signing and <u>never read over the form prior to signing</u>.  (Stanton Decl. ¶ 14.)  Moreover, the fact that review of the Loan documents allowed Plaintiff to discover the discrepancy further supports the Court's finding that any mistake made in filling out the form did not

24

cause harm to Plaintiff.  Thus, there can be no causal connection between any of the alleged failures of the HUD-1 form and the fact that Plaintiff entered into the Loan with terms differing from those anticipated.

As to Plaintiff's claim that Fidelity Escrow should have advised her about, "inter alia, mortgage broker fees [and] inconsistent and fluctuating interest rates[,]" (Opp'n at 15), this argument is similar to Plaintiff's theory in negligence and is not supported by case law or the explicit Escrow Instructions between Fidelity Escrow and Plaintiff.[10]  The terms of the Loan were a matter between Plaintiff and her lender, Countrywide, and her mortgage broker, Loan Network. Plaintiff could have reviewed the Loan terms with her mortgage broker prior to signing documents at Fidelity Escrow, requested to view the documents at Fidelity Escrow prior to signing, or, once at Fidelity Escrow for settlement, Plaintiff could have, and should have, taken the time to review the documents before she signed them.  "[I]t is a fundamental rule of contract law that a competent party who signs a written instrument is bound by its terms; and in the absence of allegations of mistake, fraud, or duress, a failure to read or understand the contents of the instrument cannot relieve the signing party of the obligation imposed therein."

---

[10]  In claiming breach of fiduciary duty, Plaintiff does not allege Fidelity Escrow had any knowledge of wrongdoing.

Liberty Bank v. Shimokawa, 632 P.2d 289, 292 (Haw. App. 1981) (citations omitted).  Moreover, Plaintiff fails to explain how Fidelity Escrow could have known that the terms of the Loan differed from those that had been previously estimated to Plaintiff.  Fidelity Escrow was not Plaintiff's attorney nor was it her mortgage broker; it was the depository for the transaction and had no duty to scrutinize the Loan's terms.

Accordingly, the Court **DENIES** Fidelity Escrow's Motion as to Count XIV only as to Plaintiff's factual allegations regarding Fidelity Escrow's failure to timely provide Plaintiff with the Loan Documents and **GRANTS** Fidelity Escrow's Motion as to Count XIV as to all other allegations.

C.      HRS Chapter 480 Violations

HRS § 480-29(a) provides in pertinent part: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."  "[T]wo distinct causes of action have emerged under § 480-2(a): 1) claims alleging unfair methods of competition; and 2) claims alleging unfair or deceptive acts or practices."  Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc., 148 P.3d 1179, 1207 (Haw. 2006).  Here, Plaintiff alleges that Fidelity Escrow engaged in "unfair or deceptive acts or practices."  The statute, however, does not specifically define the terms "unfair" or "deceptive" acts or practices.

26

The Hawai`i Intermediate Court of Appeals has adopted the definition that "a practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Tokuhisa v. Cutter Management Co., 223 P.3d 246, 259 (Haw. App. 2009) (citation omitted); Balthazar v. Verizon Haw., Inc., 123 P.3d 194, 202 (Haw. 2005).  In addition, the Supreme Court of Hawai`i has noted that

> [i]t is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to define unfair practices so that the definition will fit business of every sort in every part of this country. Whether competition is unfair or not generally depends upon the surrounding circumstances of the particular case. What is harmful under certain circumstances may be beneficial under different circumstances.

Haw. Med. Ass'n, 148 P.3d at 1209 (citation and internal quotation marks omitted).

The Supreme Court of Hawai`i has "referred to the meaning of a deceptive practice by citing the definition employed by federal courts with respect to 'an act causing, as a natural and probable result, a person to do that which he or she would not otherwise do.'" Balthazar, 123 P.3d at 202 (citation and brackets

27

omitted).[11]  A deceptive practice has also been defined as having "the capacity or tendency to mislead or deceive."  Tokuhisa, 223 P.3d at 259 (quoting State by Bronster v.United States Steel Corp., 919 P.2d 294, 312, 313 (Haw. 1996)).  The Supreme Court of Hawai`i also stated that "actual deception need not be shown; the capacity to deceive is sufficient."  U.S. Steel Corp., 919 P.2d at 313.

Hawai`i courts have also adopted a three-part analytical test for "deception" based upon in In re Cliffdale Assocs., Inc., 103 F.T.C. 110 (1984). Tokuhisa, 223 P.3d at 260.  The test states a deceptive act or practice is:

> (1) a representation, omission, or practice [ ] that (2) is likely to mislead consumers acting reasonably under the circumstances [where] (3)[ ] the representation, omission, or practice is material.
>
> A representation, omission, or practice is considered "material" if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.

Id. (quotations and internal marks and citations omitted).  Moreover, the Tokuhisa court clarified that the Cliffdale Assocs. test is objective, turning on whether the act or omission "is likely to mislead consumers," as to information "important to consumers," in making a decision regarding the product or service.  Id. (internal marks and quotations omitted).  Accordingly, the application of an objective

---

[11] The statute also directs courts to construe the chapter "in accordance with judicial interpretations of similar federal antitrust statutes[.]" HRS § 480-3.

"reasonable person" standard, such as in the <u>Cliffdale Assocs.</u> test, is ordinarily for the trier of fact, rendering summary judgment "often inappropriate." <u>Id.</u> ((internal marks and quotations omitted).

Hawai`i courts have indicated that the terms unfair and deceptive should be interpreted broadly. Specifically, the Supreme Court of Hawai`i and its appellate courts have stated that HRS § 480-2

> outlaws unfair methods of competition and unfair or deceptive trade practices in sweeping terms. It was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen and businesswomen.

<u>Han v. Yang</u>, 931 P.2d 604, 619 (Haw. App. 1997) (citations, internal quotation marks, and brackets omitted).

As to remedies for a violation of HRS Chapter 480, HRS § 480-13, entitled "[s]uits by persons injured; amount of recovery, injunctions[,]" provides that

> ....

> (b)   Any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480-2:

> > (1)   May sue for damages sustained by the consumer[.]

29

HRS § 480-13.  Hawai`i courts have held that a claim under § 480-13 must

establish four essential elements

> (1) a violation of chapter 480; (2) injury to plaintiff's business or
> property resulting from such violation; (3) proof of the amount of
> damages; and (4) a showing that the action is in the public interest or
> that the defendant is a merchant.

Tokuhisa, 223 P.3d at 261 (quotation omitted).

Here, Plaintiff's unfair and deceptive trade practice claim alleges that

Fidelity Escrow failed to properly prepare the disclosures on the final HUD-1,

prepared a "combined" written HUD-1 settlement statement instead of separating

out the statements for the First and Second Mortgage, failed to disclose the

ultimate recipient of the stated "$990 'processing fee,'" failed to separately

disclose the amount of money paid to Plaintiff from the proceeds of the First and

Second Mortgages, and failed to provide her copies of the escrow documents.

(Opp'n at 13-14, 17-19; Compl. ¶¶ 32, 57, 58, 63.)

Again, like Plaintiff's breach of fiduciary claim, all of Plaintiff's

allegations, except Plaintiff's allegation regarding failure to timely provide copies

of the escrow documents, involve the actual manner in which the HUD-1 was

completed in a way that Plaintiff argues failed to comply with RESPA Appendix

A.[12]  However, as explained above, Plaintiff cannot demonstrate causation or

damages with respect to these factual allegations.  Plaintiff offers no explanation

regarding how these alleged errors caused her to enter into the Loan with different

terms than she had anticipated.  Therefore, there can be no causal connection

between any of the alleged failures of the HUD-1 form and any damages caused to

Plaintiff from her entry into the Loan or inability to rescind the Loan.  See

Tokuhisa, 223 P.3d at 261 (quotation omitted) (requiring a Plaintiff to demonstrate

"injury to plaintiff's business or property resulting from such violation[,]" and

"proof of the amount of damages.").

        As to Fidelity Escrow's alleged failure to timely provide Plaintiff with

the Loan documents, the Court has already found that this act implicates Fidelity

---

[12] Fidelity Escrow argues that Plaintiff's allegation that Countrywide's $2,687.50 payment to Loan Network (characterized by Plaintiff as a "yield spread premium") "does not appear in the '800' section of the Final HUD-1" Settlement Statement is mistaken.  (See Mot. at 14 (citing Compl. ¶ 63).)  As Fidelity Escrow asserts, Line 814 refers of the HUD-1 to "Other charges – See Attached," and the $2,687.50 payment to Loan Network is listed on the third page of the HUD Settlement Statement.  (PCSF, Ex. E.)  Such a practice is supported by Appendix A, which states that "Lines 808 and additional sequentially numbered lines[] . . . may also be used to record other required disclosures from the loan originator.  Any such disclosures must be listed outside the columns."  (Appendix A.)  However, in opposition, Plaintiff argues that because there were two yield spread premiums in the HUD-1 that were disclosed in different fashions, that such a practice was misleading. (Opp'n at 18.)  Because, as explained in this Order, Plaintiff cannot show causation, the Court does not address this argument.

Escrow's contractual duty and violates RESPA regulations if true.  However, the fact that such an action is contrary to RESPA (or contractual mandates) does not constitute a per se unfair business practice because RESPA and HRS § 480-2 have differing "scope and application."  See Hawaii Community Federal Credit Union v. Keka, 11 P.3d 1, 229 n.15 (Haw. 2000) (holding that a violation of TILA does not constitute a per se violation of HRS § 480-2).

RESPA was enacted to "reform[] . . . the real estate settlement process . . . to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country[,] 12 U.S.C. § 2601(a), whereas "HRS § 480-2 was designed to prevent fraudulent business practices directed against consumers."  Id.  "Thus, although the ultimate objective of both statutes is consumer protection, they effect their common purpose by non-coextensive means."  Id. (citation omitted).

Nonetheless, the Court finds that Plaintiff has presented sufficient factual allegations and support to create a genuine issue of fact of whether Fidelity Escrow engaged in unfair or deceptive trade practices in violation of HRS § 480-2 by failing to timely provide the Loan documents at closing.  A reasonable person

could construe Fidelity Escrow's alleged failure to provide the Loan documents at closing or prior to the expiration of the rescission period as told to Plaintiff by Fidelity as substantially injurious and/or as a material act likely to affect choice and having the capacity to deceive. Fidelity Escrow's arguments regarding lack of causation and damages as to its alleged failure to timely provide the Loan documents to Plaintiff fail as explained above with regards to breach of fiduciary duty.

Plaintiff also alleges as an "unfair or deceptive practice" that Fidelity Escrow dispersed funds belonging to Plaintiff when it knew or should have known that the subject loans involved an improper scheme to deprive Plaintiff of money and/or fraud. (Opp'n at 19.) Because Plaintiff provides no factual support for any "knowledge" by Fidelity Escrow, Plaintiff's allegation fails as a matter of law, as more thoroughly analyzed below in connection with Plaintiff's claims of aiding and abetting and civil conspiracy. Last, Plaintiff also states that Fidelity Escrow "falsely represent[ed] to Plaintiff that it was acting in her interest." Plaintiff also provides no factual support for this allegation. (Id.) The Court can only surmise that perhaps Plaintiff is alleging that an oral representation had been made to her. However, such a vague, unsupported argument is not enough to survive summary judgment. Moreover, it is clear by the Escrow Instructions that Fidelity Escrow

"serve[d] ONLY as an Escrow Holder in connection with [the] instructions and [could not] give legal advice to any party [thereto]."  (Yoza Decl., Ex. D ¶ 19.)

Accordingly, the Court **DENIES** Fidelity Escrow's Motion as to Count VIII only as to Plaintiff's claim regarding failure to timely receive the Loan Documents and **GRANTS** Fidelity Escrow's Motion as to Count VIII as to all other allegations.

> D.      Derivative Tort Claims: Aiding and Abetting (Count XII) and Civil Conspiracy (Count XI)

The prime distinction between civil conspiracy and aiding and abetting is described as

> a conspiracy involves an agreement to participate in a wrongful activity or to commit a tortious act; aiding and abetting focuses on whether a defendant knowingly gives "substantial assistance" to someone who performs wrongful conduct, not on whether the defendant agrees to join the wrongful conduct.

15A C.J.S. Conspiracy § 3 (Aiding and abetting compared and distinguished).

> 1.      Aiding and Abetting (Count XII)

The Court first addresses Plaintiff's claims against Fidelity Escrow for aiding and abetting.  Defendants assert that California law and the Restatement (Second) of Torts § 876, entitled "Persons Acting in Concert," applies

34

to Plaintiff's claim of aiding and abetting.  (Mot. at 23-24.)   Restatement (Second)

of Torts § 876(b) "accepts a [civil] doctrine with rough similarity to criminal

aiding and abetting."  <u>Central Bank of Denver, N.A. v. First Interstate Bank of</u>

<u>Denver, N.A.</u>, 511 U.S. 164 (1994) (quoting the Restatement (Second) of Torts §

876(b) (1977)).

> Restatement (Second) of Torts § 876 in full states:

> For harm resulting to a third person from the tortious conduct of
> another, one is subject to liability if he

>> (a)   does a tortious act in concert with the other or pursuant
>>        to a common design with him, or

>> (b)   knows that the other's conduct constitutes a breach of
>>        duty and gives substantial assistance or encouragement
>>        to the other so to conduct himself, or

>> (c)   gives substantial assistance to the other in accomplishing
>>        a tortious result and his own conduct, separately
>>        considered, constitutes a breach of duty to the third
>>        person.

Restatement (Second) of Torts § 876.  In California, liability may be imposed on

one who aids and abets the commission of an intentional tort if the person

> (a) knows the other's conduct constitutes a breach of duty and gives
> substantial assistance or encouragement to the other to so act or (b)
> gives substantial assistance to the other in accomplishing a tortious
> result and the person's own conduct, separately considered,
> constitutes a breach of duty to the third person.

See, e.g., Gonzales v. Lloyds TSB Bank, PLC, 532 F. Supp. 2d 1200, 1206 (C.D. Cal. 2006)  (holding that investors stated claim against bank for aiding and abetting scheme operators' breach of fiduciary duties and fraud); Restatement (Second) Torts § 876(b) & (c); Fiol v. Doellstedt, 50 Cal. App. 4th 1318, 1325-26 (1996); Saunders v. Superior Court, 27 Cal. App. 4th 832, 846 (1994) (citing Restatement (Second) Torts § 876(b)&(c)); Neilson v. Union Bank of California, N.A., 290 F. Supp. 2d 1101, 1118 & n.77 (C.D. Cal. 2003).  Accordingly, California uses Subsections (b) and (c) of the Restatement (Second) Torts § 876 as a test for civil aiding and abetting of intentional torts.

Hawai`i courts have not explicitly articulated a test for civil aiding and abetting.  See Unity House, Inc. v. North Pacific Inv., Inc., 918 F. Supp. 1384, 1390 & n. 5 (D. Haw. 1996) ("even assuming there existed aiding and abetting liability for fraud in Hawaii, Unity House would not survive summary judgment on this claim"); see also Nakamoto v. Hartley, 758 F. Supp. 1357, 1366 (D. Haw. 1991) ("Hawaii courts have given no indication that on a fraud claim brought under Hawaii common law, a defendant may be held liable for aiding and abetting a fraud . . . .") (citation omitted).  However, the court in Television Events & Marketing, Inc. v. Amcon Distributing Co., 488 F. Supp. 1071 (D. Haw. 2006) rejected an argument that these cases supported a contention that aiding and

36

abetting a breach of fiduciary duty was not a viable cause of action in Hawai`i.  Id.

at 1076-77.  As the court stated:

> In both Nakamoto and Unity House, the courts recognized that Hawaii
> had not indicated whether a cause of action for aiding and abetting
> fraud existed, but neither court reached the issue because the
> respective plaintiffs failed to make any allegations to support such a
> claim. These rulings in no way foreclose the possibility of an aiding
> and abetting a breach of fiduciary duty claim under Hawaii law.

Moreover, Hawai`i courts generally rely on the Restatement (Second) of Torts as

the appropriate statement of law.  See, e.g., id. (collecting cases in which Hawai`i

courts have considered and adopted various sections of the Restatement (Second)

of Torts).

As to the Restatement at issue, Hawai`i has cited Restatement

(Second) of Torts § 876(a) in support of a cause of action for civil conspiracy.  See

Combs v. Case Bigelow & Lomabardi, 222 P.3d 465, *15 (Haw. App. Jan. 27,

2010) (unpublished), cert. denied, No. 28773, 2010 WL 2342860 (Haw. June 10,

2010).[13]  Importantly, Tahara v. Matson Terminals, Inc., 136 P.3d 904, *3 n.3

(Haw. 2006) (unpublished)[14] provides an indication that Hawai`i courts would

---

[13] Hawai`i Rule of Appellate Procedure 35(c)(2) provides that any
unpublished disposition may be cited for persuasive value.

[14] The Court finds this unpublished decision to be illustrative, although it is
not relying on it as precedent pursuant to Haw. R. App. P. 35(c).

likely choose to follow California authority in relying on the Restatement (Second) of Torts § 876 subsections (b) and (c) to create a cause of action for the civil aiding and abetting of intentional torts.

In <u>Tahara</u>, the underlying action arose out of an employment-related altercation between plaintiff Quentin Hideyuki "Rocky" Tahara ("Tahara") and defendant Bruce Perry ("Perry").  <u>Id.</u> at *1.  The facts show that Tahara complained to a work supervisor that Perry had left work without permission, and subsequently, Perry allegedly committed a battery on Tahara.  <u>Id.</u> In his complaint, Tahara alleged, <u>inter alia</u>, a cause of action of battery against Perry and also claimed that Henry Kreutz ("Kreutz") was liable for Perry's act of battery because Kreutz confronted Tahara regarding Tahara's complaint to the supervisor.  <u>Id.</u> at **2-3.  In addressing Kreutz's alleged liability for Perry's battery, the Supreme Court of Hawai`i relied on Restatement (Second) of Torts § 876(a) and (b).  In a footnote, the court stated that

> To the extent Tahara's argument can also be construed as relying upon subsection (b) of Restatement (Second) of Torts § 876, Tahara's argument is without merit inasmuch as he fails to establish that Kruetz owed any duty to Tahara.

<u>Id.</u> at *3 n.3.  Although the <u>Tahara</u> Court cited to Subsection (b) of the Restatement in its finding, this Court concludes that the court actually applied Subsection (c) of

38

the Restatement, as explained below.  Restatement (Second) of Torts § 876(b)

states that

> For harm resulting to a third person from the tortious conduct of
> another, one is subject to liability if he . . . knows that the other's
> conduct constitutes a breach of duty and gives substantial assistance
> or encouragement to the other so to conduct himself[.]

Restatement (Second) of Torts § 876(b).  Here, Kruetz's duty to Tahara is not at

issue in Subsection (b).  Instead, at issue in the Subsection is Kruetz's alleged

knowledge that the other's conduct—here Perry's conduct of committing a battery

on Tahara—constituted a breach of duty to Tahara.

Restatement (Second) of Torts § 876(c) states that

> For harm resulting to a third person from the tortious conduct of
> another, one is subject to liability if he . . . gives substantial assistance
> to the other in accomplishing a tortious result and <u>his own conduct,</u>
> <u>separately considered, constitutes a breach of duty to the third person</u>.

Restatement (Second) of Torts § 876(c) (emphasis added).  Thus, it is the potential

violation of Subsection (c) that involves Kruetz's alleged duty to Tahara.

Accordingly, the Hawai`i Supreme Court in <u>Tahara</u> appears to have considered the

entirety of Restatement (Second) of Torts § 876 in analyzing Kruetz's liability for

Perry's actions.

39

In <u>Television Events & Marketing, Inc.</u>, a Hawai`i district court found <u>Tahara</u> illustrative of Hawai`i law regarding aiding and abetting.  <u>Television Events & Marketing, Inc.</u>, 488 F. Supp. 2d at 1076.  The district court held that

> [t]he Hawaii Supreme Court recently considered the viability of a claim brought pursuant to Section 876. . . . In <u>Tahara</u>, the court went as far as to lay out the elements of a Section 876 claim before ruling that the specific facts of the case did not give rise to a claim under the Restatement. . . . As the Hawaii Supreme Court has now clearly recognized and applied Section 876 in <u>Tahara</u>, which is closely related to Sections 312 and 138,[15] this Court concludes that a third party's interference with one's fiduciary duty to another is actionable under Hawaii law.

<u>Id.</u>  This Court agrees with <u>Television Events & Marketing, Inc.</u> and finds the weight of authority in support of a cause of action for civil aiding and abetting an intentional tort under Hawai`i law as defined by the Restatement (Second) of Torts § 876 subsections (b) and (c).

This Court's determination that Hawai`i state courts would follow California as to the legal principals for aiding and abetting is further supported by the fact that Hawai`i courts will generally look to California law for guidance when Hawai`i precedent is absent on a specific issue.  <u>Locricchio v.</u>

---

[15] Each of the stated sections requires either that a person "giv [es] substantial assistance," "intentionally caus[es] or assist[s]," or "collude[s]," and recognize liability for an overt act by a third party that disrupts the duty of a fiduciary or agent to another.

40

Legal Services Corp., 833 F.2d 1352, 1357 (9th Cir. 1987); see also Sutherland v.

Kanohi Ohana, Ltd., 776 F.2d 1425, 1427 n.4 (9th Cir. 1985).  Accordingly, the

Court finds that Restatement (Second) of Torts § 876(b) and (c), as also elaborated

upon by California case law, provides the appropriate law by which to assess

Plaintiff's claim that Fidelity Escrow aided and abetted Countrywide and/or Loan

Network to violate H.R.S. Chapter 480 and/or commit fraud.

As to the first test for aiding and abetting requiring knowledge

that the other's alleged conduct constituted a breach of duty, the court in  Casey v.

U.S. Bank Nat'l Ass'n, 127 Cal. App. 4th 1138, 1144 (2005) found that to satisfy

the knowledge prong, the defendant must have "actual knowledge of the specific

primary wrong the defendant substantially assisted." Id. at 406; see also Central

Bank of Denver, N.A., 511 U.S. 164 (quoting the Restatement (Second) of Torts §

876(b)).

The Supreme Court of Hawai`i would likely agree with the

actual knowledge standard set forth in Casey as evidenced by its decision in

Bishop.  Although Bishop involved a situation regarding direct liability for an

escrow committing an intentional tort, as explained above, the court found that

when a party to a transaction where an escrow is utilized engages in fraudulent

41

activity, an escrow is not liable when it acts in good faith and did not have actual

knowledge of wrongdoing.  Bishop, 751 P.2d at 78.

   Plaintiff's claims against Loan Network and Countrywide for

H.R.S. Chapter 480 violations (Counts VI, VII) stem from the allegations that the

two companies misrepresented the terms of the loan and failed to disclose all loan

fees and charges in an alleged "bait-and-switch" like transaction.[16]  (See Opp'n at

21.)   Plaintiff's Complaint does not make any factual allegations regarding her

claim of aiding and abetting.  (Compl. ¶¶ 184-188.)  In her Concise Statement of

Facts, as to knowledge, Plaintiff alleges that Fidelity Escrow's actions of aiding

and abetting consisted of receiving information containing inconsistent loan terms

that were materially different from Plaintiff's Good Faith Estimates, including

"hugely escalating mortgage broker fees . . . and the personal payment to Mia

Taylor [of Loan Network][,]" and failing to share this information with Plaintiff.[17]

---

[16] Although Plaintiff's Complaint appears to contend that Fidelity Escrow
"aided" and gave "substantial assistance" to Loan Network in violation of the
CROA, 15 U.S.C. § 1679b(a)(1) (Count XII (Aiding and abetting), Compl. ¶¶
111-115, 184-188),  Plaintiff concedes in her Opposition that no derivative liability
is sought against Fidelity Escrow pursuant to the CROA.  (Opp'n at 24-25.)
Accordingly, the Court does not address this issue.

[17] As explained above, under Hawai`i law, an escrow company has no duty
to police a transaction.  Plaintiff's continued assertions to the contrary may be
successful in other jurisdictions, see Home Loan Corp. v. Texas American Title

(continued...)

42

(PCSF ¶ 5; Opp'n at 22.)  However, Plaintiff does not allege Fidelity Escrow had knowledge of Plaintiff's Good Faith Estimates or what accurate mortgage broker fees or payments should have been and therefore does not adequately allege that Fidelity Escrow had specific knowledge that the final Loan terms differed from those agreed upon by Plaintiff and Loan Network. Further, as discussed above, the Escrow Instructions did not provide Fidelity Escrow with a duty to investigate the Loan terms.

Moreover, review of the documents alleged by Plaintiff to provide evidence supporting her claims against Fidelity Escrow does not provide the Court with any information to ascertain that Fidelity Escrow would have known about an alleged breach of duty by Loan Network or Countrywide.  The documents provided by Plaintiff simply furnish information regarding the Loan terms that Loan Network wished Fidelity Escrow to incorporate into Plaintiff's HUD-1 settlement statement.  (PCSF, Ex. 8 (01/11/07 email stating "interest on new 1st @ 9.5% for 21 days" and "interest on new 2nd @ 7.5% for 21 days") , Ex. 9 (01/11/07 estimated HUD request stating First Mortgage interest at 7.5% and

_____

[17](...continued)

Co., 191 S.W.3d 728, 731 (Tex. App. 2006) (collecting cases regarding an escrow holder's duties in different jurisdictions), but as per Bishop, an escrow in Hawai`i has no duty of disclosure unless specified by the agreement or unless they have knowledge of wrongdoing. Bishop, 751 P.2d at 81.

Second Mortgage at 9.5%), Ex. 10 (closing instructions on the First Mortgage listing an 8.5 % initial interest rate), Ex. 11 (closing instructions on the Second Mortgage listing an 10.625 % initial interest rate).)  Although Plaintiff also states that Fidelity Escrow did not provide Plaintiff with the estimated HUD form prepared on January 1, 2007 that it provided to Loan Network, it appears from Plaintiff's exhibits that such a form was issued solely in order to show Loan Network that inaccuracies had been corrected.  (PCSF, Ex. 8.)  Moreover, this first estimated HUD, with the first set of interest rates, stated an anticipated settlement date of January 19, 2007, whereas the later closing instructions were issued for Plaintiff's actual settlement date of February 1, 2007 for the Loan.  (PSCF ¶ 8.)  Further, Plaintiff's evidence shows that Fidelity Escrow provided Loan Network with the final Loan closing documents on February 12, 2007, at the same time as Plaintiff.  (PCSF, Ex. 12.)

            As the court in <u>Casey</u> stated, the actual knowledge standard requires more than a vague suspicion of wrongdoing.  The <u>Casey</u> court rejected a trustee's "general allegation that the banks knew the DFJ Fiduciaries were involved in 'wrongful or illegal conduct'" as a "kitchen sink" allegation that did "not constitute sufficient pleading that the banks had actual knowledge the DFJ Fiduciaries were misappropriating funds from DFJ." <u>Casey</u>, 127 Cal. App. 4th at

44

1152-53.  Under <u>Casey</u>'s approach, Fidelity Escrow must have known more than

that "something fishy was going on."  <u>Id.</u> at 1149.  Here, there are no facts to

indicate Fidelity Escrow would have even known of anything "fishy" in the Loan

transaction.

As discussed above, Fidelity Escrow was under no obligation to

Plaintiff to verify the Loan documents conformed to Plaintiff's Good Faith

Estimates or to make sure that she received preferable interest rates or mortgage

broker fees.[18]  Instead, Fidelity Escrow was required only to comply with the

Escrow Instructions.  Plaintiff's claim fails under the first test for aiding and

abetting, Restatement (Second) of Torts § 876(b), because she offers no evidence

to create a genuine issue of material fact as to Fidelity Escrow's knowledge that the

terms provided to it from Loan Network differed from those agreed upon by Loan

Network and Plaintiff and that this action was meant to defraud or deceive

Plaintiff.

However, here, the Court must also analyze Plaintiff's claim

under the Restatement (Second) of Torts § 876(c) because Plaintiff also alleges an

independent breach of duty by Fidelity Escrow and, as explained below,

---

[18] In fact, this Court has no evidence of whether the Loan in fact differed
from Plaintiff's Good Faith Estimates as such estimates were not submitted to this
Court.

45

knowledge of wrongdoing is not required under this test of aiding and abetting.[19]

Again, taking all the facts in a light most favorable to the Plaintiff, Fidelity Escrow committed a breach of fiduciary duty by failing to provide Plaintiff with the Loan documents at settlement.  Assuming, as Plaintiff has contended, that had she received the documents before February 5, 2007—the expiration date of the rescission period as affirmatively told to Plaintiff by Fidelity Escrow—she would have exercised her right to rescind, this conduct, separately considered, constitutes a breach of duty to Plaintiff.  See Gonzales, 532 F. Supp. 2d at 1206; Restatement (Second) Torts § 876; Casey, 127 Cal. App. 4th at 1144.

Therefore, the question before the Court is whether Fidelity Escrow's alleged actions gave "substantial assistance to the other in accomplishing [an alleged] tortious result."  Restatement (Second) Torts § 876(c).  Restatement (Second) Torts § 876, comment on Clause (c) states:

> When one personally participates in causing a particular result in accordance with an agreement with another, he is responsible for the result of the united effort if his act, considered by itself, constitutes a breach of duty and is a substantial factor in causing the result, irrespective of his knowledge that his act or the act of the other is tortious.

---

[19] The Supreme Court of Hawai`i's decision in Bishop did not involve a claim of aiding and abetting and also did not involve an allegation of an independent breach of duty by the escrow holder.  Bishop, 751 P.2d 77.

Restatement (Second) Torts § 876, comment on Clause (c).  In discussing

substantial assistance in the context of the first test for aiding and abetting, the

comments to § 876 clarify that

> If the encouragement or assistance is a substantial factor in causing
> the resulting tort, the one giving it is himself a tortfeasor and is
> responsible for the consequences of the other's act.  This is true both
> when the act done is an intended trespass . . . and when it is merely a
> negligent act. . . . The rule applies whether or not the other knows his
> act is tortious.

Restatement (Second) Torts § 876, comment on Clause (b).

As to Plaintiff's claim of substantial assistance, Plaintiff alleges

that Fidelity Escrow rushed Plaintiff through the Loan signing process and failed to

provide Plaintiff with a copy of the Loan documents until her rescission period had

expired.[20]  (PCSF ¶¶ 8-11.)  Taking all facts in the light most favorable to the

Plaintiff, these alleged actions could be seen as Fidelity providing "substantial

assistance" to the other defendants' alleged intentional conduct,[21] notwithstanding

---

[20] Again, the Court notes that this statement is based on the February 5, 2007
date of expiration of the rescission period as affirmatively told to Plaintiff by
Fidelity Escrow and not the actual day on which Plaintiff's right to rescind expired.

[21] The Court notes that Fidelity Escrow's knowledge that Plaintiff believed
that her TILA rescission period would expire before she received the documents
goes to "substantial assistance" but does not provide the Court with any evidence
that Fidelity Escrow had knowledge of Countrywide and Loan Network's alleged
wrongful acts as is argued by Plaintiff.  This is equally true with respect to

(continued...)

47

Plaintiff's own failure to insist upon reading the documents at closing.[22]

Therefore, taking all facts in the light most favorable to Plaintiff, Fidelity Escrow could be found to have aided and abetted Countrywide and Loan Network if it is found to have breached its duty to Plaintiff by failing to timely provide the Loan documents.  However, there are no facts to show Fidelity Escrow knowingly provided assistance to Countrywide and/or Loan Network in their alleged commission of unfair business practices or fraud, and Plaintiff's claim for aiding and abetting under this theory fails as a matter of law.  Accordingly, the Court **DENIES** Fidelity Escrow's Motion as to Count XII.

2.      Civil Conspiracy (Count XI)

As to Plaintiff's civil conspiracy claim, "'the accepted definition of a conspiracy is a combination of two or more persons [or entities] by

---

[21](...continued)
Plaintiff's allegation that Fidelity Escrow "rushed" her through closing.  Here, Fidelity Escrow's actions or failure to act with respect to providing the Loan documents timely (or providing Plaintiff with the incorrect rescission date), without more, does not imply knowing complicity.  In fact, here, the Lender's Closing Instructions specifically instructed Fidelity Escrow to provide Plaintiff with the Loan documents at closing (PCSF, Ex. 7 ¶ 10), which again weighs against an allegation of intentional complicity.

[22] Plaintiff alleges that she only received the signature page of the HUD form at closing and was never shown a copy of the Loan documents.  (Stanton Decl. ¶ 14.)

concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means.'" Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc., 982 P.2d 853, 881 n.28 (Haw. 1999) (quoting Duplex Printing Press Co. v. Deering, 254 U.S. 443, 466 (1921)) (alteration in original).  The plaintiff must allege an underlying actionable claim because "there can be no civil claim based upon a conspiracy alone . . . ."  Weinberg v. Mauch, 890 P.2d 277, 286 (1995); see Ellis v. Crockett, 451 P.2d 814, 822-23 (1969).  Here, Plaintiff's claim of conspiracy is based upon her claims of fraud against Loan Network and Countrywide.  (Compl. ¶¶ 179-183.)

"A conspiracy is constituted by an agreement . . . No formal agreement between the parties is essential to the formation of the conspiracy,  for the agreement may be shown if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose."  Marino v. United States, 91 F.2d 691, 694 (9th Cir. 1937);

> The existence of the joint assent of the parties need not be proved directly. Like any other ultimate fact, it may be found as an inference from facts proved. It is enough if the evidentiary facts and circumstances -- pieced together and considered as a whole -- convince the judicial mind that the parties united in an understanding way to accomplish the fraudulent scheme.

Kazuo Hashimoto v. Halm, NO. 2847, 1953 WL 7576, at *5 (Haw. Terr. Nov. 20,

1953); State v. Yoshida, 361 P.2d 1032, 1042 (1961) ("[t]he existence of a conspiracy may be inferred from the circumstances.").

In Vieux v. East Bay Regional Park Dist., 906 F.2d 1330, 1343 (9th Cir. 1990), the Ninth Circuit upheld summary judgment in favor of defendants because plaintiff was unable to provide specific evidence that the defendants agreed among themselves to act against the plaintiff for an unlawful purpose. Id. In Vieux, the plaintiff's evidence of "correspondence or discussions" between the defendants was insufficient because no "illegal objective" was demonstrated. Id.

Here, similar to Plaintiff's allegations of knowledge in relation to aiding and abetting, Plaintiff also cannot show that Fidelity Escrow united with Loan Network or Countrywide in an understanding way to accomplish a fraudulent scheme. Plaintiff's Complaint does not make any factual allegations regarding her claim of civil conspiracy. (Compl. ¶¶ 179-183.) In her Concise Statement of Facts, Plaintiff apparently relies on the same facts underlying her claim of aiding and abetting. The only facts before the Court regarding communications are solely between Fidelity Escrow and Loan Network regarding what terms to incorporate into Plaintiff's HUD or in the Lender's Closing Instructions specifically directing Fidelity Escrow to provide Plaintiff with the Loan documents. Such actions involve the normal course of business regarding the transaction, and there are no

50

facts to show that there was an "illegal objective" to such communications.  Even "mere acquiescence or knowledge is insufficient to constitute a conspiracy, absent approval, cooperation or agreement."  <u>Robert's Hawai`i</u>, 982 P.2d at 889 n.44 (citation omitted).  For all the reasons above, Plaintiff does not have a cognizable claim of civil conspiracy.

Plaintiff argues in her Opposition that she "intends to conduct additional discovery."  If in further discovery Plaintiff's counsel discovers evidence that supports a claim for civil conspiracy, counsel may file a motion for leave to amend the Complaint to re-allege the count of civil conspiracy against Fidelity Escrow.   Accordingly, the Court **GRANTS WITHOUT PREJUDICE** Fidelity Escrow's Motion as to Count XI.

<u>CONCLUSION</u>

For the reasons stated above, the Court **GRANTS IN PART WITH AND WITHOUT PREJUDICE AND DENIES IN PART** Defendant's Motion (Doc. # 31) as detailed below:

Defendant's Motion is **GRANTED** as to Count XIII and **GRANTED WITHOUT PREJUDICE** as to XI.

The Court **DENIES** Defendant's Motion as to Count XII.

51

The Court **DENIES** Defendant's Motion as to Count VIII only as to Plaintiff's claim regarding failure to receive the Loan Documents and **GRANTS** Defendant's Motion as to Count VIII as to all other allegations.

The Court **DENIES** Fidelity Escrow's Motion as to Count XIV only as to Plaintiff's factual allegations regarding Fidelity Escrow's failure to timely provide Plaintiff with the Loan Documents and **GRANTS** Fidelity Escrow's Motion as to Count XIV as to all other allegations.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, October 19, 2010.



_____
David Alan Ezra
United States District Judge

Stanton v. Bank of America, N.A., et al., Cv. No. 09-00404 DAE-LEK; AMENDED ORDER GRANTING IN PART WITH AND WITHOUT PREJUDICE AND DENYING IN PART DEFENDANT FIDELITY NATIONAL TITLE & ESCROW OF HAWAII'S MOTION FOR SUMMARY JUDGMENT