IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CAROLYN ROSEMARY ESPINA STANTON, | ) ) ) | CIVIL NO. 09-00404 LEK-BMK |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO COUNTRYWIDE BANK, N.A., ET AL., | ) ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART BANK OF AMERICA, N.A.'S MOTION FOR SUMMARY JUDGMENT AND DENYING FIDELITY ESCROW NATIONAL TITLE & ESCROW OF HAWAII, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNTS 8, 12, & 14 OF PLAINTIFF'S FIRST AMENDED COMPLAINT

On June 15, 2011, Defendant Bank of America, N.A.,
successor by merger to Countrywide Bank, N.A. ("BOA"), filed its
Motion for Summary Judgment ("BOA Motion") and its concise
statement of facts in support of the BOA Motion ("BOA CSOF").
Also on June 15, 2011, Defendant Fidelity National Title & Escrow
of Hawaii, Inc. ("Fidelity Escrow") filed its Renewed Motion for
Summary Judgment on Counts 8, 12, & 14 of Plaintiff's First
Amended Complaint ("Fidelity Escrow Motion") and its concise
statement of facts in support thereof ("Fidelity Escrow CSOF").
On September 14, 2011, Plaintiff Carolyn Rosemary Espina Stanton
("Plaintiff") filed her: memorandum in opposition to the BOA

Motion; concise statement of facts in opposition to the BOA
Motion ("Plaintiff's BOA CSOF"); memorandum in opposition to the
Fidelity Escrow Motion; and concise statement of facts in
opposition to the Fidelity Escrow Motion ("Plaintiff's Fidelity
Escrow CSOF").  On September 14, 2011, Fidelity Escrow filed a
statement of no position as to the BOA Motion.  BOA filed its
reply memorandum ("BOA Reply") on September 21, 2011, and
Fidelity Escrow filed its reply memorandum ("Fidelity Escrow
Reply") on September 20, 2011.

These matters came on for hearing on October 5, 2011.
Patricia McHenry, Esq., appeared on behalf of BOA.  Jade Ching,
Esq., and J. Blaine Rogers, Esq., appeared on behalf of Fidelity
Escrow.  Colin Yost, Esq., and George Zweibel, Esq., appeared on
behalf of Plaintiff.  After careful consideration of the motions,
supporting and opposing memoranda, and the arguments of counsel,
the BOA Motion is HEREBY GRANTED IN PART AND DENIED IN PART, and
the Fidelity Escrow Motion is HEREBY DENIED for the reasons set
forth below.

## BACKGROUND

Plaintiff filed this action on August 27, 2009.
Defendant Loan Network LLC ("Loan Network") failed to respond to
the Complaint, and Plaintiff obtained an entry of default on
October 1, 2009.  On April 12, 2010, pursuant to a stipulation by
the parties, [dkt. no. 25,] Plaintiff filed her First Amended

Complaint [dkt. no. 26].

Some of the basic facts of this case are set forth in a dispositive order filed before the case was reassigned to this Court.

I.   The Transaction

Plaintiff alleges that she purchased the property located at 5404 Poola Street, Honolulu, Hawai`i 96821 (the "Property") in 2003.  ("[First Amended] Compl." ¶ 18, Doc. # 26.)  In late 2006, Plaintiff states that she discussed refinancing the Property with the mortgage broker for the transaction, Defendant Loan Network LLC ("Loan Network") in order to "obtain cash for house upgrades and improvements."  (Id. ¶¶ 18-19.)  The lender for the transaction was Defendant Bank of America, N.A., successor by merger to Countrywide Bank, N.A. ("Countrywide").  (Id. ¶¶ 8, 24-25.)  Pursuant to written instructions from the parties, and specifically the instructions between Plaintiff and Defendant Fidelity National Title & Escrow of Hawaii, Inc. ("Fidelity Escrow" or "Defendant"), Fidelity Escrow served as the escrow depository for the refinancing loan transaction.  (Id. ¶ 29; Doc. # 32, Declaration of Dot Yoza, "Yoza Decl." ¶ 3 & Ex. D.)  The escrow instructions signed and accepted by Plaintiff (the "Escrow Instructions") provide, inter alia, that:

> [Fidelity Escrow] serves ONLY as an Escrow Holder in connection with these instructions and cannot give legal advice to any party hereto.
>
> Escrow Holder is not to be accountable or liable for the sufficiency or correctness as to form, manner of execution, or validity of any instrument deposited in this escrow, nor as to the identity, authority or rights of any person executing the same.  Escrow Holder's duties hereunder shall be limited to the proper handling of such money and the proper safekeeping of such instruments, or other documents received by Escrow Holder,

3

and for the disposition of same in accordance
with the written instructions accepted by
Escrow Holder.

(Yoza Decl., Ex. D ¶ 19.)

As alleged by Plaintiff, the principal amount
of the first loan was $1,500,000.00. ([First
Amended] Compl. ¶ 37.)  The first loan is
evidenced by a mortgage dated February 1, 2007 and
recorded February 12, 2007, in the Office of the
Assistant Registrar of the Land Court of the State
of Hawai`i ("Land Court") as Document No. 3558893
(the "First Mortgage").  (Id.; Doc. # 32,
Declaration of Moritz "Moritz Decl.," Ex. B.)  The
principal amount of the second loan was
$215,000.00, and the second loan is evidenced by a
mortgage dated February 1, 2007 and recorded
February 12, 2007, in the Land Court as Document
No. 3558894 (the "Second Mortgage") (collectively,
the First Mortgage and Second are hereinafter the
"Loan").  ([First Amended] Compl. ¶ 49; Moritz
Decl., Ex. C.)  Plaintiff states that she signed
the relevant Loan documents at Fidelity Escrow's
offices and did not read them.  ([First Amended]
Compl. ¶¶ 31, 32, 34, 46.)  Plaintiff refinanced
her Property with the two loans and obtained over
$330,000 in cash.  (Id., Exs. E, F.)

Stanton v. Bank of Am., N.A., Cv. No. 09-00404 DAE-LEK, 2010 WL

4176375, at *1 (D. Hawai`i Oct. 19, 2010).[1]

Plaintiff alleges that, before she signed the Loan

Documents, Loan Network made various representations to her about

what the terms of the loans would be.

•Although Plaintiff did not qualify for the single, fixed-rate
loan that she wanted, she would still qualify for "excellent

---

[1] This citation refers to the Amended Order Granting in Part
With and Without Prejudice and Denying in Part Defendant Fidelity
National Title & Escrow of Hawaii's Motion for Summary Judgment.
The Court will refer to this order as the "10/19/10 Summary
Judgment Order".

rates" and would have a combined mortgage payment of "well under $8,500" per month. [First Amended Complaint at ¶¶ 20-22; Pltf.'s BOA CSOF, Decl. of Carolyn Rosemary Espina Stanton ("Stanton BOA Decl.") at ¶ 9.]

- The loans would have no more than a one-year prepayment penalty. [Stanton BOA Decl. at ¶ 10.]
- According to two Good Faith Estimates dated January 2, 2007 that Loan Network provided from Countrywide ("1/2/07 Good Faith Estimates"): the first loan, for $1,505,000, would be a thirty-year loan at 6.500% per annum, with a monthly principal and interest payment of $4,840.67; and the second loan, for $215,000, would be a fifteen-year loan at 6.000% per annum, with a monthly principal and interest payment of $1,289.03.[2] [Id. at ¶¶ 11, 13.]

Plaintiff states that she relied upon these representations in deciding to obtain the two loans, and she did not receive any communications about changes to the terms of the loans between her receipt of the 1/2/07 Good Faith Estimates and the closing. [Id. at ¶¶ 15, 17.] She states that, on the closing date, she was not given copies to keep of any of the documents that she signed. [Id. at ¶¶ 22-23.] Plaintiff did not discover the true terms of the loans until sometime after she received her copies of the documents on or about February 12 or 13, 2007. [Id. at ¶¶ 26-27.] The true loan terms include:

- The interest on the first loan was initially 8.500% per annum and "was to be adjusted each month equal to the applicable 12-month U.S. Treasury Securities rate (the 'index') plus 3.575% (the 'margin'), up to a maximum of 9.950%." [First Amended Complaint at ¶ 37; Stanton BOA Decl. at ¶ 28.]
- The monthly payments for the first year would be $5,358.65 based on a rate of 1.750%, and would be adjusted each year thereafter. A payment cap, however, limited the amount that

---

[2] Unsigned copies of the 1/2/07 Good Faith Estimates are attached to Plaintiff's BOA CSOF as Exhibits 1 and 2 to the Stanton BOA Declaration.

the resulting monthly payments could exceed the prior year's payments.  This would result in negative amortization up to 115% of the original principal amount, at which time the monthly payments could change more frequently and would not be subject to the cap.  [First Amended Complaint at ¶¶ 38-39; Stanton BOA Decl. at ¶ 29.]

- Countrywide estimated that the monthly payments would increase to $13,612.59 in less than three-and-a-half years.  [Pltf.'s BOA CSOF, Decl. of Colin A. Yost ("Yost BOA Decl."), Exh. 7 (Truth in Lending Disclosure Statement, dated February 1, 2007, stating that the first loan had 319 payments of $13,612.59 and a final payment of $13,608.96).]
- The first loan had a three-year prepayment penalty.  [Yost BOA Decl., Exh. 8 (Prepayment Penalty Addendum for first loan).]
- The second loan was a home equity line of credit of up to $215,000 that Plaintiff could draw from for five years, with a possible five-year extension.  The rate was initially 10.625% per annum, but was "to be adjusted each month to equal the applicable highest prime rate published in <u>The Wall Street Journal</u> (the 'index') plus 2.375% (the 'margin'), up to a maximum of 18.000% per annum."  [First Amended Complaint at ¶ 49; Stanton BOA Decl. at ¶ 28.]
- At the 10.625% rate, the monthly, interest-only payments during the draw period would be $1,903.65.  [First Amended Complaint at ¶ 52.]
- After the draw period, there was "a 15-year repayment period, during which minimum payments equal to 1/180th of the outstanding principal balance plus accrued finance charges would be required."  [<u>Id.</u> at ¶ 51.]

Plaintiff states that, if she "had been provided with the loan documents and/or an estimated settlement statement on February 1, 2007, [she] would have cancelled the transaction on or before February 5, 2007."  [Stanton BOA Decl. at ¶ 35.]  Plaintiff also states that "[o]ver a period of many months," she and others acting on her behalf, including a California attorney, attempted to communicate with Countrywide about the "changed terms" of the loans, but Countrywide would not talk to them.  [<u>Id.</u> at ¶ 39.]

The First Amended Complaint acknowledges that, on

February 1, 2007, Plaintiff was instructed to sign a "Notice of Right to Cancel" in connection with both loans. [First Amended Complaint at ¶¶ 44, 54.] She also alleges that, as to the first loan, she was instructed to sign two different "Truth in Lending Disclosure Statements" and each had "a different 'annual percentage rate,' 'finance charge,' 'amount financed,' 'total of payments,' payment schedule, and other credit terms." [Id. at ¶ 45.] Plaintiff states that, on or after February 12, 2007, she received a Notice of Right to Cancel for each loan "stating that the date of the transaction was February 1, 2007 and that [she] had until midnight on February 5, 2007 to cancel each loan."[3] [Stanton BOA Decl. at ¶ 36, Exh. 4 (Notice of Right to Cancel for the first loan), Exh. 5 (Notice of Right to Cancel for the second loan).]

Plaintiff alleges that she exercised her right to rescind both loans, but BOA did not allow rescission. [First Amended Complaint at ¶¶ 88, 94, 103, 109.] The instant action followed.

The First Amended Complaint alleges the following claims: a Truth in Lending Act ("TILA") claim seeking rescission of the first loan and recoupment (Count I); a TILA damages claim against BOA based on the first loan (Count II); a TILA claim

---

[3] The Court will refer to the documents collectively as the "2/5/07 Cancellation Notices".

seeking rescission of the second loan and recoupment (Count III);
a TILA damages claim against BOA based on the second loan (Count
IV); a claim for violations of the Credit Repair Organizations
Act against Loan Network (Count V); an unfair or deceptive acts
or practices ("UDAP") claim against BOA, alleging violations of
Haw. Rev. Stat. §§ 480-2(a) and/or 481A-3 (Count VI); a UDAP
claim against Loan Network (Count VII); a UDAP claim against
Fidelity Escrow (Count VIII); a fraud claim against BOA (Count
IX); a fraud claim against Loan Network (Count X); a civil
conspiracy claim alleging that Countrywide, Loan Network, and
Fidelity Escrow conspired to defraud Plaintiff (Count XI); an
aiding and abetting claim against Countrywide, Loan Network, and
Fidelity Escrow (Count XII); a negligence claim against Fidelity
Escrow (Count XIII); and a breach of fiduciary duty claim against
Fidelity Escrow pursuant to Haw. Rev. Stat. § 449-16 (Count XIV).

        The First Amended Complaint seeks: injunctive and
ancillary relief during the pendency of this action; rescission
and recoupment of both loans; a declaratory judgment that any
contract or agreement for the two loans is void and
unenforceable; actual, compensatory, and statutory damages;
punitive damages; reasonable attorneys' fees and costs; and any
other appropriate relief.

        Fidelity Escrow filed a motion for summary judgment
("Fidelity Escrow 2010 Motion") on May 5, 2010.  [Dkt. no. 31.]

On July 30, 2010, United States District Judge David Alan Ezra issued his Order Granting in Part With and Without Prejudice and Denying in Part Defendant Fidelity National Title & Escrow of Hawaii's Motion for Summary Judgment. [Dkt. no. 42.] Fidelity Escrow filed a motion for reconsideration on August 13, 2010, and BOA filed a joinder on August 20, 2010. [Dkt. nos. 46, 48.] On October 18, 2010, Judge Ezra issued an amended order denying the motion for reconsideration,[4] 2010 WL 4115403, but the order also stated that he would issue an amended summary judgment order addressing the issues raised on reconsideration. The 10/19/10 Summary Judgment Order followed.

In the 10/19/10 Summary Judgment Order, Judge Ezra: granted summary judgment to Fidelity Escrow as to Count XIII, negligence; granted summary judgment without prejudice to Fidelity Escrow as to Count XI, civil conspiracy;[5] denied Fidelity Escrow summary judgment as to Count XII, aiding and abetting; denied Fidelity Escrow summary judgment on Count VIII,

_____

[4] Judge Ezra issued the original order denying Fidelity Escrow's motion for reconsideration on September 30, 2010. [Dkt. no. 52.]

[5] Plaintiff stated in her opposition to the Fidelity Escrow 2010 Motion that she intended to conduct more discovery. The 10/19/10 Summary Judgment Order gave Plaintiff leave to file a motion to amend her complaint to re-allege the civil conspiracy claim against Fidelity Escrow if the additional discovery revealed evidence supporting the claim. Stanton, 2010 WL 4176375, at *19. Plaintiff, however, never sought leave to file a second amended complaint.

UDAP, as to the portion of the claim based on failure to timely provide the Loan Documents;[6] granted summary judgment to Fidelity Escrow as to all other allegations in Count VIII; denied Fidelity Escrow summary judgment on Count XIV, breach of fiduciary duty, as to the portion of the claim based on failure to timely provide the Loan Documents; and granted summary judgment to Fidelity Escrow as to all other allegations in Count XIV. Stanton, 2010 WL 4176375, at *19.

## I.  BOA's Motion

In the BOA Motion, BOA first asserts that, contrary to Plaintiff's claims, Loan Network prepared Good Faith Estimates for two loans for Plaintiff in December 2006.  The first was for a $1,505,000 loan with a thirty-year term and an adjustable interest rate, starting at 7.5%.  [BOA CSOF, Declaration of Ana Alvarado ("Alvarado Decl."), Exh. C.]  The second was a $215,000 interest-only loan, with a thirty-year term at a fixed rate of 9.5%.  [Id., Exh. D.]  After reviewing Plaintiff's loan application, however, Countrywide issued a counter offer of 8.5% and 10.625% for the two loans, [Mem. in Supp. of BOA Motion at 2,] which Plaintiff accepted [Alvarado Decl., Exh. E (email dated 1/8/07 from Robin Lefcourt regarding "stanton acceptance")].

---

[6] The 10/19/10 Summary Judgment Order does not contain a definition of the term "Loan Documents".  Fidelity argues that it was Judge Ezra's intent that the term refer to all documents associated with the First Mortgage and the Second Mortgage. [Mem. in Supp. of Fidelity Escrow's Motion at 1 n.2.]

Loan Network issued new Good Faith Estimates with the new
interest rates on January 31, 2007, and Plaintiff signed them on
February 1, 2007. [Id., Exhs. F, G.] BOA emphasizes that the
1/2/007 Good Faith Estimates with the rates Plaintiff allegedly
relied upon are not signed. [Mem. in Supp. of BOA Motion at 3
n.1.]

BOA does not contest Plaintiff's description of the
terms of loans she ultimately entered into. [Id. at 3; Alvarado
Decl., Exh. H (Monthly Adjustable Rate PayOption Note), Exh. I
(Home Equity Credit Line Agr. & Disclosure Stat.), Exh. J
(Amortization Schedule for first loan), Exh. K (document BOA
describes as the TILA disclosure for the first loan), Exh. L
(Important Terms of Our Home Equity Line of Credit).]

BOA emphasizes that the 2/5/07 Cancellation Notices,
which Plaintiff signed, stated, *inter alia*:

> You have a legal right under federal law to cancel
> this transaction, without cost, within THREE
> BUSINESS DAYS from whichever of the following
> events occurs last:
>
> (1) The date of the transaction, which is
>         2/1/2007     ; or
> (2) The date you received your Truth in
>     Lending disclosures; or
> (3) the date you received this notice of
>     your right to cancel.
>
> . . . .
>
> If you cancel by mail or telegram, you must
> send the notice no later than MIDNIGHT of
>         2/5/2007     (or MIDNIGHT of the THIRD
> BUSINESS DAY following the latest of the three

events listed above.)

[Alvarado Decl., Exhs. M, N (emphases in original).]  BOA also emphasizes that Plaintiff acknowledges that the closing instructions Countrywide provided to Fidelity Escrow provided that Fidelity Escrow was to give Plaintiff a copy of the Loan Documents at closing.  [Mem. in Supp. of BOA Motion at 4; Pltf.'s CSOF in Opp. to Fidelity Escrow 2010 Motion, at ¶ 12, Decl. of Colin A. Yost, Exh. 7 (closing instructions).]

BOA argues that Counts I through IV, the TILA claims, fail because TILA and Regulation Z expressly contemplate that lenders may deliver notices of the right to cancel and other material disclosures after the consummation of the loan.  BOA urges the Court to apply Palmer v. Champion Mortgage, which held that "a properly completed notice of right to cancel, even if received after the date of the transaction, 'complie[s] with the applicable TILA requirements.'"  [Mem. in Supp. of BOA Motion at 6-7 (citing 465 F.3d 24, 31 (1st Cir. 2006)).]  BOA acknowledges that the 10/19/10 Summary Judgment Order recognized that the Ninth Circuit has not squarely considered the issue whether a notice like the ones Plaintiff received would be considered a technical TILA violation.  BOA distinguishes Semar v. Platte Calley Federal Savings & Loan Ass'n, 791 F.2d 699 (9th Cir. 1986), which held that the failure to fill in the blank for the expiration date on a rescission form was a violation of TILA.  In

the present case, the date was filed in, making the case more like Palmer than Semar. [Id. at 9-10.]

BOA also emphasizes that 15 U.S.C. § 1635(h), enacted in 1995, prohibits rescission claims based on the form of the notice of right to cancel where the lender used the appropriate form, such as the form published by the Board of Governors of the Federal Reserve System ("the Board"). BOA argues that, in light of such amendments to TILA, "'Congress has now leaned against a penalty approach and, perhaps, weakened the present force of the older case law,' including Semar." [Mem. in Supp. of BOA Motion at 10 (quoting Melfi v. WMC Mortg. Corp., 568 F.3d 309, 313 (1st Cir. 2009)).] BOA argues that several other courts have rejected borrowers' claims of TILA violations based on the date they received a properly completed notice of right to cancel. [Id. at 11-12 (citing Ware v. Indymac Bank, FSB, 534 F. Supp. 2d 835 (N.D. Ill. 2008); Colanzi v. Savings First Mortgage, LLC, No. 07-3632, 2008 WL 161170 (E.D. Pa. Jan 16, 2008); Mourer v. Equicredit Corp., 309 B.R. 502 (Bankr. W.D. Mich. 2004); Chabot v. Wash. Mut. Bank, 369 B.R. 1, 15 (Bankr. D. Mont. 2007)).]

BOA next argues that Count VI (UDAP) and Count IX (fraud) fail because Plaintiff cannot support her factual allegations, and she cannot show causation or damages. BOA categorizes Plaintiff's UDAP allegations as relating to either Countrywide's alleged attempts to deprive Plaintiff of her right

13

to cancel, or alleged misrepresentations in early Good Faith Estimates regarding terms and costs of the loans. [Id. at 15.] BOA argues that there is no evidence to support the first category of allegations because Countrywide's closing instructions expressly required the closing agent to provide Plaintiff with the Loan Documents, including the notices of right to cancel. [Id. at 15-16.] As to the second category, BOA argues that Plaintiff cannot establish that Countrywide's acts caused her to enter into loans with unanticipated terms, because the terms were disclosed to her before she executed the loans. Plaintiff could have reviewed the documents before she signed them, but she chose not to do so. [Id. at 16-17.] Further, the alleged UDAPs cannot form the basis of a fraud claim because the alleged representations about the more favorable terms were "'mere prognostication or prophecy as to happening of future events and did not concern an existing material fact and it was utterly unreasonable for [Plaintiff] to rely upon such representations.'" [Id. at 19 (quoting Stahl v. Balsara, 587 P.2d 1210, 1214 (Haw. 1978)).]

Finally, BOA argues that Count XII (aiding and abetting) and Count XI (conspiracy) fail because Plaintiff cannot produce evidence that Countrywide knew of, substantially assisted with, or agreed to participate in, any of the other defendants' tortious acts. BOA also argues that Plaintiff cannot prove an

14

independent breach of duty by Countrywide.  [Id. at 20-23.]
Plaintiff cannot show that Countrywide and Loan Network united to
accomplish a fraudulent scheme.  The correspondence between those
two entities occurred in the normal course of business and does
not show any illegal objective.  [Id. at 23 (citing 10/19/10
Summary Judgment Order at 50-51).]

A.   **Plaintiff's Opposition**

In addition to the factual allegations discussed *supra*,
Plaintiff emphasizes the following:

In late 2006, she first approached Loan Network
mortgage broker Sean Ramos about refinancing her home mortgage.
After inquiring with various lenders, including Countrywide, he
informed her that he would not be able to broker a deal for her
because she did not meet lender requirements.  A short time
later, Plaintiff met Robin Lefcourt, who stated that she had
recently left a position at Countrywide's Honolulu office to join
Loan Network.  Ms. Lefcourt represented that she could use her
connections at Countrywide to obtain a deal for Plaintiff.
Plaintiff provided Ms. Lefcourt the same financial information
she gave Mr. Ramos.  [Mem. in Opp. to BOA Motion at 3-4 (citing
Stanton Decl. at ¶¶ 3-7).]

During the loan closing held at Fidelity Escrow's
office, a Fidelity Escrow employee, Dot Yoza, only gave Plaintiff
the signature pages of the Loan Documents to sign.  Plaintiff did

not have time to review the documents, nor did she receive any explanation about the documents. Plaintiff was not suspicious of this process because she had no reason to believe that the terms of the loans would be significantly different than what she had been promised by Countrywide and Loan Network. [Id. at 5 (citing Stanton Decl. at ¶¶ 18-21).]

As to the TILA claims, Plaintiff acknowledges that the notice of right to cancel can be delivered after loan consummation, but Plaintiff emphasizes that the rescission period does not begin to run until the notice is given, and she asserts that a notice which does not comply with § 226.15(b) or § 226.23(b) cannot trigger the rescission period. [Id. at 14-15.] Plaintiff argues that TILA required Countrywide to deliver a corrected notice with the proper expiration date. [Id. at 15 (citing Semar v. Platte Valley Fed. S & L Assoc., 791 F.2d 699, 704 (9th Cir. 1986); Jackson v. Grant, 890 F.2d 118 (9th Cir. 1989); Williams v. Rickard, 2010 U.S. Dist. LEXIS 65391 (D. Haw. June 30, 2010); Nichols v. Deutsche Bank Nat'l Trust Co., 2007 U.S. Dist. LEXIS 86223 (S.D. Cal. Nov. 21, 2007); Smith v. Wells Fargo Credit Corp., 713 F. Supp. 354 (D. Ariz. 1989)).] Plaintiff urges the Court to reject Palmer and Melfi because they contradict Ninth Circuit law and present an anomalous standard. [Id. at 16.] Further, other circuits have adopted strict standards similar to Semar, a case that the Ninth Circuit has

never disturbed.  [Id. at 18 (citing Hamm v. Ameriquest Mortgage
Co., 506 F.3d 525 (7th Cir. 2007); Handy v. Anchor Mortgage
Corp., 464 F.3d 760, 764 (7th Cir. 2006) (applying strict reading
of TILA requirements in a rescission case); Mars v. Spartanburg
Chrysler Plymouth, Inc., 713 F.2d 65 (4th Cir. 1983); Williamson
v. Lafferty, 698 F.2d 767, 768-69 (5th Cir. 1983)).]  Plaintiff
argues that this district court and others have ruled that
undated or improperly dated rescission notices violate TILA.
[Id. at 19-20 (some citations omitted) (citing Riopta v. Amresco
Residential Mort. Corp., 101 F. Supp. 2d 1326, 1330 (D. Haw.
1999) (an improperly dated rescission notice violated TILA and
imposed liability on the creditor); Williams v. Rickard, *supra*
("Even a purely technical violation of TILA's disclosure
provisions, including the failure to provide a borrower with a
copy of the notice that includes the correct date the rescission
period expires, extends the duration of the right to rescind for
three years."); Smith v. Wells Fargo Cred. Corp., *supra*, 713 F.
Supp. at 356 (the correct date of rescission must be stated)).]

        Plaintiff also points out that Judge Ezra considered
this issue in the 10/19/10 Summary Judgment Order and
"criticize[d] Palmer and Melfi and all but decide[d] this issue
in favor of Plaintiff[.]"  [Id. at 20-22 (quoting 10/19/10
Summary Judgment Order at 14-16).]  Judge Ezra found that there
was a genuine issue of material fact as to whether Plaintiff

17

would have rescinded the loan if she had been provided the Loan
Documents at closing, based in part on the inaccurate date on the
notices of right to rescind.

As to the UDAP claim, Plaintiff argues that the
pervasive, material representations in the subject transaction
are sufficient to establish that Countrywide engaged in unfair
and deceptive acts. [Id. at 26-27.] Plaintiff emphasizes that
the Hawai`i Supreme Court has applied § 480-2 to "bait and
switch" mortgage transactions. [Id. at 27-28 (citing Hawaii
Community Fed. Credit Union v. Keka, 94 Haw. 213, 228-29, 11 P.3d
1, 16-17 (2000)).] Plaintiff argues that Judge Ezra's UDAP
ruling as to Fidelity Escrow do not apply to Countrywide because
Countrywide's conduct is "qualitatively and quantitatively
different". [Id. at 29.] BOA also cannot hide behind the
general contract rule that a party is bound by a contract she
signed because fraud is an exception to that rule and because
contract rules do not apply in Chapter 480 actions. [Id. at 30
(citing Williams v. Rickard, 2011 U.S. Dist. LEXIS 56702, 23-24
(D. Haw. May 25, 2011)).] As to BOA's argument that Plaintiff
cannot establish damages, Plaintiff emphasizes that de minimis
damages are sufficient for a § 480-13 claim. [Id. at 31 (citing
Wiginton v. Pacific Credit Corp., 2 Haw. App. 435, 634 P.2d 111
(1981); Zanakis-Pico v. Cutter Dodge, Inc., 98 Haw. 309, 47 P.3d
1222 (2002)).] Further, Plaintiff asserts that she has suffered

18

various damages, including the amount her loan payments exceeded what she was promised, and the undisclosed fees that she was assessed at closing. She also emphasizes that the absence of injury would not preclude her Haw. Rev. Stat. § 480-12 claim. [Id. at 31-32.]

Plaintiff argues that, for similar reasons, the record supports her fraud claim against BOA. She contends that the issues that BOA raises merely illustrate that there are genuine disputes of material fact regarding this claim. [Id. at 33-34.]

Finally, Plaintiff argues that her conspiracy claim against Countrywide is based on the fraud claims against Countrywide and Loan Network and that the existence of a conspiracy can be inferred from the allegations supporting those claims. Plaintiff argues that the evidence of a conspiracy against those two entities is much stronger than the evidence that Judge Ezra rejected against Fidelity Escrow. [Id. at 35.] Plaintiff argues that the normal business correspondence does not negate the inference of a conspiracy. [Id. at 37.] Further, the same facts also support the aiding and abetting claim. [Id. at 38.]

Plaintiff therefore urges the Court to deny the BOA Motion in its entirety.

B.    BOA's Reply

In its Reply, BOA largely reiterates its arguments from

the BOA Motion.  In addition, BOA emphasizes that Plaintiff has
no authority for her position that Countrywide was required to
provide new rescission notices with a corrected expiration date.
BOA argues that this is contrary to the model forms, the staff
commentary in Regulation Z, and the First Circuit cases discussed
*supra*.  [BOA Reply at 2-4 (citing 12 C.F.R. pt. 226, Apps. H-8,
G-5; Supp. 1, App. G ¶ 4, App. H ¶ 11; Supp. 1, cmt. 5(c)(2)).]
BOA also argues that the 10/19/10 Summary Judgment Order clearly
stated that it was not ruling on the TILA claims, and therefore
it cannot be said to have rejected <u>Palmer</u>.  [<u>Id.</u> at 9.]

        As to the fraud and UDAP claims, although Plaintiff
argues that Countrywide's and Fidelity's misconduct were
different, BOA points out that both allegedly misstated loan
terms and the loan costs.  Further, the actual terms were clearly
set forth at closing.  BOA notes that this district court
rejected a similar claim in <u>McCarty v. GCP Management, LLC</u>, No.
10-00133 JMS/KSC, 2010 WL 4812763 (D. Haw. Nov. 17, 2010).  [<u>Id.</u>
at 10-11.]  BOA argues that <u>Hawaii Community Federal Credit Union</u>
<u>v. Keka</u> is factually distinguishable.  [<u>Id.</u> at 12-13.]

        As to the conspiracy and aiding and abetting claims,
BOA argues that Plaintiff's evidence of agreement and knowledge
is merely hearsay and speculation and is not sufficient to defeat
summary judgment.  Further, Plaintiff's claim that Countrywide
must have known about Loan Network's misconduct is implausible

because Countrywide disclosed the proper loan terms and instructed Fidelity Escrow to provide Plaintiff with the Loan Documents. [Id. at 15-16.]

BOA therefore urges the Court to grant its Motion in its entirety.

## II.  **Fidelity Escrow's Motion**

Fidelity Escrow first notes that the three remaining claims against it are all based upon the allegation that it was obligated to provide the Loan Documents to Plaintiff as a third-party beneficiary of the closing instructions from Countrywide. [Mem. in Supp. of Fidelity Escrow Motion at 1-2.] According to Fidelity Escrow, the following evidence has come to light since the 10/19/10 Summary Judgment Order:

1.  Fidelity Escrow never received and did not participate in the signing of the Loan Documents generally or the Mortgage Documents specifically;
2.  Nothing in the Initial Instructions required Fidelity Escrow to provide the Loan Documents on February 1, 2007;
3.  Fidelity Escrow provided Plaintiff with all documents in its possession on February 1, 2007;
4.  the Stantons were aware that the Loan had not funded as late as February 8, 2007, but failed to contact Fidelity Escrow;
5.  Plaintiff's claims as to Fidelity Escrow's limited role in the alleged loan origination misconduct are premised on their assertion that they should have received the Notes and Mortgages specifically;
6.  the Initial Instructions were superseded by new Closing Instructions, dated February 6, 2007 ("Second Closing Instructions"); and
7.  the Second Closing Instructions imposed no

> contractual obligation on Fidelity Escrow to
> provide the Mortgage Documents to
> Plaintiff[.]

[Id. at 3-4.]  Fidelity Escrow argues that it satisfied its

fiduciary duties by providing Plaintiff with all of the documents

it had in its possession on February 1, 2007, and therefore it

cannot be liable for Plaintiff's alleged failure to receive the

other documents.  Fidelity Escrow argues that, in light of these

new facts, the Court should grant summary judgment in its favor

on Counts VIII, XII, and XIV.  [Id. at 4.]

　　　　Fidelity Escrow notes that Plaintiff's husband,

Timothy Stanton, was actively involved in the negotiation of the

loan.  [Id. at 5 (citing Fidelity Escrow CSOF, Exh. 9 (Trans.

Excerpts of 4/6/11 Depo. of Timothy Morris Stanton) at 66:7-17,

71:14-23, 123:21-124:2).]  Fidelity emphasizes the paragraph in

the Escrow Instructions quoted *supra*, pages 3-4.  [Id. at 6.]

Fidelity Escrow states that, on or around February 1, 2007,

Countrywide sent Fidelity Escrow agent Dorothy "Dot" Yoza the

"Initial Instructions", which listed the "Loan Documents" that

were to be delivered to the "Settlement Agent".[7]  The "Settlement

Agent" was either the "Signing Agent" or "any other person

directly or indirectly responsible for handling matters

---

[7] The closing instructions for the first loan and the
closing instructions for the second loan are collectively the
"Initial Instructions".  [Mem. in Supp. of Fidelity Escrow Motion
at 2 n.3 (citing Fidelity Escrow CSOF, Exhs. 2, 3).]

22

associated with the signing, funding, disbursing, or recording of the Loan." [Id. at 7.] The "Signing Agent" was "the person or entity directly responsible for 'supervising the Signing of the Loan Documents, including a Notary Public or any other individual who conducts a witness closing.'" [Id. (citing Fidelity Escrow CSOF, Decl. of Dorothy "Dot" Yoza ("Yoza Decl."), Exh. 2 (2/1/07 Closing Instructions for first loan), Exh. 3 (2/1/07 Closing Instructions for second loan), Exh. 5 (2/5/07 email to Carolyn and Tim from Dot Yoza)).]

Fidelity Escrow asserts that it was not the "Signing Agent" and that Ms. Yoza neither received nor participated in the signing of the Loan Documents. [Id. at 7-8 (citing Yoza Decl. at ¶ 8).] The Initial Instructions did require that the Loan Documents be provided to the borrower at "signing" or in accordance with other state requirements. [Id. at 8 (citing Fidelity Escrow CSOF, Yoza Decl., Exhs. 2, 3 at 17).] Fidelity Escrow, however, emphasizes that the "Signing Agent" and the "Settlement Agent" had separate and distinct roles and responsibilities. [Id. (citing Yoza Decl. Exhs. 2, 3 at 18).]

Fidelity Escrow states that, on February 1, 2007, Ms. Yoza requested Plaintiff's signature on the only documents Fidelity Escrow had in its possession: (1) the estimated HUD statement; (2) the closing instructions; (3) the demand approval for the prior lenders; (4) the preliminary report approval; and

(5) the Escrow Instructions. [Id. at 9 (citing Yoza Decl. ¶ 9, Exh. 4 (2/1/07 cover letter to Plaintiff from Dot Yoza)).] Ms. Yoza informed Plaintiff and her husband that, as of February 5, 2007, she had not been provided with the mortgage documents. She also informed them that it was her understanding that the three-day rescission period would expire at midnight on February 5, 2007. [Id. at 9-10 (citing Yoza Decl. at ¶¶ 10-11, Exh. 5).] Fidelity Escrow argues that, because Ms. Yoza did not have the Loan Documents and did not participate in the signing, she could not have provided the documents to Plaintiff. [Id. at 10 (citing Yoza Decl. at ¶ 12).] Plaintiff's husband understood that the loan had not been funded as of February 6, 2007. [Id. at 11 (citing Yoza Decl., Exh. 9 at 204:1-22).]

On February 7, 2007, Ms. Yoza received the Second Closing Instructions, which Fidelity Escrow states superseded the First Closing Instructions and listed the Form 1003 loan application as the only Loan Document. [Id. (citing Yoza Decl. at ¶¶ 15-16, Exh. 6 (2/6/07 Closing Instructions)).] It required that the Loan Document "had to be signed by February 7, 2007, after which it expired, and imposed a document delivery obligation only after the document was signed." [Id. (citing Exh. 6 at 5, 17).] Plaintiff's loan closed on February 12, 2007. Ms. Yoza sent Plaintiff a letter with the same date stating that the cash proceeds were deposited into her checking account and

that a copy of the final HUD statement was enclosed. [Fidelity Escrow CSOF, Yoza Decl., Exh. 7 (letter dated 2/12/07 to Plaintiff from Dot Yoza).]

Fidelity Escrow emphasizes that, although Plaintiff received the Loan Documents by February 13, 2007, she did not immediately exercise her right to cancel, and she did not file the instant action until more than two and a half years later. [Mem. in Supp. of Fidelity Escrow Motion at 13.] Plaintiff's husband stated at his deposition that the basis for the legal claims against Fidelity Escrow is the failure to provide the loan notes and mortgages to Plaintiff. [Id. at 14 (citing Yoza Decl., Exh. 9 at 234:2-236:17).] Fidelity Escrow, however, asserts that it did not have possession of these documents during the period in question. If Plaintiff did sign the mortgage documents on February 1, 2007, she did not do so at Fidelity Escrow's office. [Id. at 18 (citing Yoza Decl. at ¶ 8).]

Fidelity Escrow emphasizes that the 10/19/10 Summary Judgment Order recognized that Fidelity Escrow had no duty to police the loan transaction. [Id. at 19 & n.17 (some citations omitted) (citing 10/19/10 Summary Judgment Order at 13).] As a fiduciary, Fidelity Escrow's duties under the Escrow Instructions[8] were limited to responsibility for the documents it

_____

[8] The Loan Escrow Instructions Authorization Form, _i.e._ the Escrow Instructions, which Plaintiff signed, is attached to the
(continued...)

actually received.  It only received a limited number of the Loan

Documents and delivered them in a timely manner to Plaintiff.

[Id. at 20-21 (citing Yoza Decl. at ¶ 9, Exh. 4).]

As to the third-party beneficiary argument under the

Initial Instructions, Fidelity Escrow was not the "Signing Agent"

and therefore was not required to provide documents to Plaintiff.

[Id. at 22-23.]  Further, the Second Closing Instructions

superceded the Initial Instructions, and the Second Closing

Instructions show that Fidelity Escrow had only a limited role in

the transaction.  [Id. at 23-24 (citing Exh. 6).]  Fidelity

Escrow argues that, under either version of the closing

instructions, it did not have a duty to provide the Loan

Documents to Plaintiff on February 1, 2007.  [Id. at 24.]

Fidelity Escrow therefore urges the Court to grant

summary judgment in its favor on all remaining counts against it.

### A.    __Plaintiff's Opposition__

Plaintiff argues that there are genuine issues of

material fact that preclude summary judgment.  Plaintiff has

expressly stated in her declaration that Ms. Yoza facilitated the

signing of the Loan Documents at Fidelity Escrow's office.  [Mem.

in Opp. to Fidelity Escrow Motion at 1 (citing Fidelity Escrow

CSOF, Decl. of J. Blaine Rogers ("Rogers Decl."), Exh. 13

---

[8](...continued)
Fidelity Escrow CSOF as Exhibit 1 to the Yoza Declaration.

(Pltf.'s Decl. attached to her CSOF in opp. to Fidelity Escrow
2010 Motion [dkt. no. 36-1]) at ¶¶ 13-18).] Plaintiff also
testified at her deposition that she knew Ms. Yoza from another
loan document signing. [Id. at 5 (citing Pltf.'s Fidelity Escrow
CSOF, Decl. of Colin A. Yost ("Yost Fidelity Escrow Decl."), Exh.
A (Trans. Excerpts of 2/9/11 Depo. of Plaintiff) at 28:14-21).]
Further, the initial closing instructions state that the Loan
Documents were delivered to Fidelity Escrow. They also identify
Fidelity Escrow as both the Settlement Agent and the Signing
Agent. [Id. at 1 (citing Fidelity Escrow CSOF, Yoza Decl., Exh.
2 at 4).]

        Plaintiff argues that the version of events which
Fidelity Escrow currently presents must have been known to it
when it filed the Fidelity Escrow 2010 Motion, but Fidelity
Escrow did not present these factual allegations at that time.
Plaintiff asserts that the Escrow Instructions and the Initial
Closing Instructions were broad enough to allow Fidelity Escrow
to assist with the signing of the Loan Documents. [Id. at 9-11.]
Plaintiff argues that the Second Closing Instructions and
Ms. Yoza's February 1, 2007 letter to Plaintiff are red herrings.
Plaintiff contends that no document, other than Ms. Yoza's
declaration, establishes that the Second Closing Instructions
supercedes the Initial Closing Instructions. Plaintiff asserts
that all three documents are consistent and can be read together.

27

[<u>Id.</u> at 11.]  Plaintiff also emphasizes that the HUD statement

Ms. Yoza sent Plaintiff was signed and dated by both Plaintiff

and Ms. Yoza on February 1, 2007.  Plaintiff argues that this

indicates that Plaintiff likely signed it in Ms. Yoza's office on

February 1, 2007 with the other Loan Documents.  [<u>Id.</u> at 11-12

(citing Yost Fidelity Escrow Decl., Exh. B (Estimated HUD

Statement signed by Plaintiff and Fidelity Escrow dated

2/1/07)).]

Plaintiff therefore urges the Court to deny the

Fidelity Escrow Motion in its entirety.

**B.  <u>Fidelity Escrow's Reply</u>**

In its Reply, Fidelity reiterates that its obligation

to provide the Loan Documents to Plaintiff was triggered by the

signing of the documents.  Plaintiff has not presented any

evidence to contradict Fidelity Escrow's evidence that Ms. Yoza

did not participate in the signing of, or have possession of, the

Loan Documents.  [Fidelity Escrow Reply at 1-2.]

Fidelity Escrow argues that Plaintiff erroneously

frames the threshold issue as whether it facilitated the signing

of the Loan Documents.  Fidelity Escrow has presented evidence

that it owed no duty to provide the Loan Documents to Plaintiff

in the first instance.  [<u>Id.</u> at 2-3.]  Fidelity also argues that

Plaintiff has misconstrued the terms of the Escrow Instructions

and the Closing Instructions.  Plaintiff cannot spin the terms of

the contracts to overcome the fact that Fidelity Escrow was not

the Signing Agent and therefore had no duty to deliver the Loan

Documents. [Id. at 5-9.] Fidelity Escrow was responsible for

recording the relevant documents.

Fidelity Escrow emphasizes that Plaintiff cannot

remember what specific documents she signed on February 1, 2007.

[Id. at 10 (citing Rogers Decl., Exh. 13 at ¶¶ 13-15, 22-23).]

In contrast, Fidelity Escrow has submitted evidence that: it

provided her with specifically identified documents on

February 1, 2007; it did not participate in the signing of, nor

did it have possession of, the Loan Documents generally or the

Mortgage Documents specifically; and it provided Plaintiff with

the documents that it was contractually obligated to provide

her.[9] [Id. at 10-11 (citing Yoza Decl., Exh. 4; Yoza Decl. at ¶

---

[9] The Court notes that, at the hearing on the motions,
counsel for Fidelity Escrow presented argument about its role in
Plaintiff's loan closing based on documents that Fidelity Escrow
did not cite in its moving papers or include in the Fidelity
Escrow CSOF. Fed. R. Civ. P. 56(c)(1) states, in pertinent part:

> A party asserting that a fact cannot be or is
> genuinely disputed must support the assertion by:
>     (A) citing to particular parts of materials
>     in the record, including depositions,
>     documents, electronically stored information,
>     affidavits or declarations, stipulations
>     (including those made for purposes of the
>     motion only), admissions, interrogatory
>     answers, or other materials[.]

Even if the documents are attached to other documents in the
record, this Court has the discretion to determine whether or not
(continued...)

8; Rogers Decl., Exh. 14 (Trans. Excerpts of 2/9/11 Depo. of
Plaintiff) at 121:10-12).]  Fidelity Escrow emphasizes that, if
Ms. Yoza had been involved in the signing of the Mortgage
Documents, she would not have been awaiting their completion by
the notary public.  [<u>Id.</u> at 12 (citing Yoza Decl., Exh. 5).]

Fidelity Escrow therefore urges the Court to grant its
motion.

<b><u>STANDARD</u></b>

Pursuant to Federal Rule of Civil Procedure 56(a), a
party is entitled to summary judgment "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."

> Summary judgment must be granted against a
> party that fails to demonstrate facts to establish
> what will be an essential element at trial.  <u>See</u>
> <u>Celotex [Corp. v. Catrett]</u>, 477 U.S. [317,] 323
> [(1986)].  A moving party has both the initial
> burden of production and the ultimate burden of
> persuasion on a motion for summary judgment.
> <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210
> F.3d 1099, 1102 (9th Cir. 2000).  The burden
> initially falls on the moving party to identify
> for the court "those portions of the materials on
> file that it believes demonstrate the absence of
> any genuine issue of material fact."  <u>T.W. Elec.</u>
> <u>Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809
> F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex</u>
> <u>Corp.</u>, 477 U.S. at 323).  "A fact is material if it
> could affect the outcome of the suit under the
> governing substantive law."  <u>Miller [v. Glenn</u>

_____

[9](...continued)
to consider them.  <u>See</u> Fed. R. Civ. P.(c)(3).  This Court
declines to consider any documents that the parties failed to
attach to their concise statements.

<u>Miller Prods., Inc.]</u>, 454 F.3d [975,] 987 [(9th Cir. 2006)].

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything." In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. <u>Nissan Fire</u>, 210 F.3d at 1102-03. On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." <u>Miller</u>, 454 F.3d at 987. This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." <u>Miller</u>, 454 F.3d at 988 (quotations and brackets omitted).

<u>Rodriquez v. Gen. Dynamics Armament & Technical Prods., Inc.</u>, 696 F. Supp. 2d 1163, 1176 (D. Hawai`i 2010) (some citations omitted).

**DISCUSSION**

I.   **BOA's Motion**

31

## A. TILA Rescission Claims

Count I alleges that, as to the first loan, Countrywide "failed to deliver to Plaintiff two copies of a notice of the right to rescind as required by 15 U.S.C. § 1635(a) and 12 C.F.R. § 226.23(b)" and "failed to deliver to Plaintiff all 'material' disclosures as described in 12 C.F.R. § 226.23(a)(3) n.48." [First Amended Complaint at ¶¶ 85-86.] She alleges that, pursuant to § 1635(f) and § 226.23(a), she had three years after the consummation of her loan to rescind the loan, and she exercised her right to rescind within that time period. [Id. at ¶¶ 87-88.] Count III raises similar allegations as to the second loan. [Id. at ¶¶ 100-03.]

Plaintiff acknowledges that she received the 2/5/07 Cancellation Notices on or after February 12, 2007. [Stanton BOA Decl. at ¶ 36, Exhs. 4 & 5.] Plaintiff also acknowledges that a creditor may deliver the notice of the right to rescind after consummation of the loan. [Mem. in Opp. to BOA Motion at 14 (citing 12 C.F.R. §§ 226.15(b), 226.23(b)).[10]] Plaintiff,

---

[10] Section 226.23 (regarding closed-end credit) states:

> (1) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered in electronic form in accordance with the consumer consent and other applicable provisions of the E-Sign Act). The notice shall be on a separate document that
> (continued...)

32

however, argues that the 2/5/07 Cancellation Notices did not satisfy TILA's requirement that a creditor provide an obligor notice of her right rescind because they "did not state the _specific date_ on which her right to rescind would have expired, _i.e._, three business days after the date on which the notices were actually given to her." [Mem. in Opp. to BOA Motion at 14 (emphasis in original).]

The Official Staff Interpretations of Regulation Z state:

> The notice required by § 226.23(b) need not be given before consummation of the transaction. The creditor may deliver the notice after the transaction is consummated, but **the rescission period will not begin to run until the notice is given**. For example, if the creditor provides the notice on May 15, but disclosures were given and

---

[10](...continued)
identifies the transaction and shall clearly and conspicuously disclose the following:
  (i) The retention or acquisition of a security interest in the consumer's principal dwelling.
  (ii) The consumer's right to rescind the transaction.
  (iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.
  (iv) The effects of rescission, as described in paragraph (d) of this section.
  (v) The date the rescission period expires.
(2) Proper form of notice. To satisfy the disclosure requirements of paragraph (b)(1) of this section, the creditor shall provide the appropriate model form in Appendix H of this part or a substantially similar notice.

§ 226.23(b); see also § 226.15(b) (same for open-end credit).

> the transaction was consummated on May 10, the
> 3-business day rescission period will run from May
> 15.

12 C.F.R. Pt. 226, Supp. I ¶ 23(b)(4) (emphasis added); <u>see also</u>

¶ 15(a)(4) (same for open-end credit). The issue in this case is

whether the 2/5/07 Cancellation Notices triggered the three-day

rescission period.

BOA contends that the 2/5/07 Cancellation Notices were

effective, and therefore Plaintiff's rescission period expired on

midnight of the third business day after she received the 2/5/07

Cancellation Notices, which Plaintiff states happened "on or

after February 12, 2007[.]" [Stanton BOA Decl. at ¶ 36.] BOA

urges the Court to apply <u>Palmer v. Champion Mortgage</u>, in which

the First Circuit held that a similar cancellation notice

"complied with the applicable TILA requirements." 465 F.3d 24,

31 (1st Cir. 2006). Similar to the instant case, the plaintiff,

Amy Palmer, entered into a loan secured by a mortgage on her

residence, and she left the March 28, 2003 closing without copies

of the documents she executed. Palmer received copies of the

loan documents in the mail several days later. <u>Id.</u> at 25-26.

Palmer's notice of right to cancel contained virtually identical

language to the 2/5/07 Cancellation Notices. In particular, it

stated: "If you cancel by mail or telegram, you must send the

notice no later than midnight of APRIL 01, 2003 (or midnight of

the third business day following the latest of the three (3)

34

events listed above)." <u>Id.</u> at 26.  Palmer did not remember the

exact date she received the loan documents in the mail, but it

was sometime after April 1, 2003.  <u>Id.</u>  In holding that the

notice was clear and did not trigger the extended three-year

rescission period, the First Circuit stated:

> Although the Notice does state in part that
> rescission has to occur "no later than midnight of
> APRIL 01, 2003," the plaintiff wrests this
> statement from its contextual moorings.  The
> statement is followed immediately by a
> parenthetical reading "(or midnight of the third
> business day following the latest of the three (3)
> events listed above)."  We fail to see how any
> reasonably alert person-that is, the average
> consumer-reading the Notice would be drawn to the
> April 1 deadline without also grasping the
> twice-repeated alternative deadlines.

<u>Id.</u> at 28-29.  BOA contends that <u>Palmer</u> is indistinguishable and

that this Court should follow <u>Palmer</u> and other similar cases.

Further, BOA emphasizes that 15 U.S.C. § 1635(h), which

was enacted in 1995, states:

> An obligor shall have no rescission rights arising
> solely from the form of written notice used by the
> creditor to inform the obligor of the rights of
> the obligor under this section, if the creditor
> provided the obligor the appropriate form of
> written notice published and adopted by the Board,
> or a comparable written notice of the rights of
> the obligor, that was properly completed by the
> creditor, and otherwise complied with all other
> requirements of this section regarding notice.

BOA notes that this amendment, and others, "were aimed in general

to guard against widespread rescissions for minor violations[,]"

and they indicate that "Congress has now leaned against a penalty

approach and, perhaps, weakened the present force of the older case law favoring extension of the rescission deadline." <u>Melfi v. WMC Mortg. Corp.</u>, 568 F.3d 309, 313 (1st Cir. 2009).

Plaintiff responds that this Court should not follow <u>Palmer</u> and <u>Melfi</u> because those cases are contrary to <u>Semar v. Platte Valley Federal Savings & Loan Ass'n</u>, 791 F.2d 699 (9th Cir. 1986), which the Ninth Circuit has never disturbed. The Semars signed their loan documents on July 16, 1982. <u>Semar</u>, 791 F.2d at 701. "Platte Valley's form omitted the expiration date, although it stated that the rescission right expired three business days after July 16. Platte Valley concedes this technical violation of TILA." <u>Id.</u> at 702 (footnote omitted). In affirming the district court's ruling that the Semars were entitled to rescission, the Ninth Circuit emphasized that TILA applies to all consumers, not only to sympathetic consumers. <u>Id.</u> at 704-05.

> TILA and Reg Z contain detailed disclosure requirements for consumer loans. A lender's violation of TILA allows the borrower to rescind a consumer loan secured by the borrower's primary dwelling. 15 U.S.C. § 1635(a). **Technical or minor violations of TILA or Reg Z, as well as major violations, impose liability on the creditor and entitle the borrower to rescind. "To insure that the consumer is protected . . . [TILA and Reg Z must] be absolutely complied with and strictly enforced."** <u>Mars v. Spartanburg Chrysler Plymouth, Inc.</u>, 713 F.2d 65, 67 (4th Cir. 1983) (holding that technical violation, even if merely a "minor variation in language and type size" from TILA requirements, imposes liability); <u>see also</u> <u>Huff v.</u>

> Stewart-Gwinn Furniture Co., 713 F.2d 67, 69 (4th
> Cir. 1983) (minor violations of TILA and Reg Z
> impose liability even if, as creditor alleged,
> consumer "was not misled and was given a
> meaningful and correct disclosure of crucial
> credit terms").
>
> Reg Z "makes clear that failure to fill in
> the expiration date of the rescission form is a
> violation of the TILA." Williamson v. Lafferty,
> 698 F.2d 767, 768-69 (5th Cir. 1983). Williamson
> held that the omission of the expiration date,
> though a purely technical violation of TILA,
> entitled the plaintiff to rescind the loan
> agreement for up to three years, without regard to
> whether the omission was material. Id. at 768;
> see also Aquino v. Public Finance Consumer
> Discount Co., 606 F. Supp. 504, 507 (E.D. Pa.
> 1985) (omission of expiration date of rescission
> right gives borrower right to rescind loan).

Id. at 703-04 (footnotes omitted) (alterations in Semar)
(emphasis added).

Even though the Ninth Circuit decided Semar in 1986,
prior to the 1995 amendments, the Ninth Circuit continues to
adhere to the principles in Semar. See, e.g., Rubio v. Capital
One Bank, 613 F.3d 1195, 1199 (9th Cir. 2010) (quoting Hauk v. JP
Morgan Chase Bank USA, 552 F.3d 1114, 1118 (9th Cir. 2009);
Jackson v. Grant, 890 F.2d 118, 120 (9th Cir. 1989)). Further,
this Court rejects BOA's argument that § 1635(h) impliedly
superceded Semar. The Court agrees with the reasons stated in
Bakker v. Wells Fargo Home Mortgage:

> There is no indication that the Ninth Circuit
> considers Semar to have been overruled by the
> statute, nor does the language of the statute
> support such a conclusion. In addition, the
> requirement remains that the expiration date of
> the right to rescind must be set forth "clearly

> and conspicuously in writing, in a form that *the consumer may keep*." 12 C.F.R. § 226.17. (emphasis added).

No. CV-10-82-HU, 2011 WL 1124041, at *4 (D. Or. Feb. 28, 2011).[11]

The Court therefore concludes that <u>Semar</u> is still binding Ninth Circuit precedent and, to the extent that <u>Melfi</u> suggests that the 1995 TILA amendments weakened <u>Semar</u> and other similar cases, this Court declines to apply <u>Melfi</u>.

BOA also emphasizes that it used a model disclosure form published by the Board, and BOA argues that this is deemed to be compliance with the applicable disclosures. [BOA Reply at 2-3 (citing 15 U.S.C. §§ 1604(b), 1635(h)).] Section 1604(b) states, in pertinent part:

> A creditor or lessor shall be deemed to be in compliance with the disclosure provisions of this subchapter with respect to other than numerical disclosures if the creditor or lessor (1) uses any appropriate model form or clause as published by the Board, or (2) uses any such model form or clause and changes it by (A) deleting any information which is not required by this subchapter, or (B) rearranging the format, if in making such deletion or rearranging the format, the creditor or lessor does not affect the substance, clarity, or meaningful sequence of the disclosure.

BOA points out that the Board's model forms,[12] which the 2/5/07

---

[11] This citation refers to the magistrate judge's findings and recommendation to deny the defendants' motion to dismiss, which the district judge adopted. 2011 WL 1102844 (D. Or. Mar 25, 2011).

[12] <u>See</u> 12 C.F.R. Pt. 226, Appx. H, H-8 Rescission Model Form
(continued...)

Cancellation Notices are based upon, address the possibility that notice may be delivered late or that the date provided for the transaction date may be an estimate. [BOA Reply at 3-4 (quoting 12 C.F.R. pt. 226, Supp. 1, App. G ¶ 4, App. H ¶ 11).]

The Official Staff Interpretations for Model Form H-8 note that:

> The last paragraph of [the] model form contains a blank for the date by which the consumer's notice of cancellation must be sent or delivered. A parenthetical is included to address the situation in which the consumer's right to rescind the transaction exists beyond 3 business days following the date of the transaction, for example, where the notice or material disclosures are delivered late or where the date of the transaction in paragraph 1 of the notice is an estimate. The language of the parenthetical is not optional.

12 C.F.R. Pt. 226, Appx. H, ¶ 11; see also id., Appx. G, ¶ 4 (same for Model Form G-5). BOA is correct that the Official Staff Interpretations clearly contemplate the possibility of a lender using an estimated date for the closing date or of a borrower receiving the disclosure late, and that § 1604(b) deems use of the appropriate model form to be compliance with the TILA disclosure provisions. This, however, does not end the inquiry.

> Although Section 1604 deems a lender in compliance with non-numeric disclosures *as a matter of form* if a lender uses a model form or a substantially similar version, an interpretation

---

[12](...continued)
(General) (for closed end loans); id., Appx. G, G-5 Rescission Model Form (When Opening an Account) (for open-end loans).

of the statute as shielding lenders from liability
for errors of substance in completing the model
form contradicts the statute's requirement of
accurate disclosures.  Section 1604 may prevent a
borrower from contending that a part of the model
form was confusing or unclear.  It does not,
however, prevent a borrower from asserting a claim
on the ground that the lender did not accurately
fill out the form as required by the statute.  In
fact, § 1635(h) provides the protection afforded
to a lender for use of the proper form of notice
of the right to rescind applies only if the form
is "properly completed by the creditor, and [the
creditor] otherwise complied with all other
requirements of this section regarding notice."

Barnes v. Chase Home Finance, LLC, No. 11-CV-142-PK, 2011 WL
4950111, at *13 (D. Or. Oct. 18, 2011) (emphasis and alteration
in original).  This Court agrees with the reasoning in Barnes.
In spite of the use of the model forms in this case, Plaintiff
may still assert a claim that the three-year rescission period
applied because, under the specific circumstances of the
transactions at issue, Plaintiff did not receive clear and
conspicuous notice of her right to cancel.  Whether the
disclosures that Plaintiff received were clear and conspicuous is
a question of fact that is not appropriate for summary judgment.

The Court therefore DENIES BOA's Motion as to Count I
and Count III, Plaintiff's TILA rescission claims.

B.    **TILA Damages Claims**

Plaintiff alleges that she exercised her right to
rescind both the first loan and the second loan pursuant to TILA.
[First Amended Complaint at ¶¶ 88, 103.]  Count II and Count IV

seek damages for BOA's failure to allow rescission. [Id. at ¶¶ 94-95, 109-10.] Insofar as Plaintiff has raised a genuine issue of fact as to whether the three-year rescission period applies, there is also a genuine issue of material fact as to Plaintiff's claims that she is entitled to damages because BOA failed to honor the exercise of her rescission rights. The Court therefore DENIES BOA's Motion as to Count II and Count IV, Plaintiff's TILA damages claims.

###    C.    UDAP

Count VI alleges a UDAP claim against BOA based on a myriad of actions and representations that Countrywide allegedly engaged in with respect to the origination of the subject loans. [First Amended Complaint at ¶¶ 120.(1)-(20).] The applicable standard is set forth in the 10/19/10 Summary Judgment Order. Stanton, 2010 WL 4176375, at *10-11. In particular, this Court emphasizes that the test for a deceptive act or practice is an objective, reasonable person standard, "turning on whether the act or omission 'is likely to mislead consumers,' as to information 'important to consumers,' in making a decision regarding the product or service." Id. at *11 (quoting Tokuhisa v. Cutter Mgmt. Co., 122 Hawai`i 181, 195, 223 P.3d 246, 260 (Ct. App. 2009)).

First, to the extent that Plaintiff bases her UDAP claim on the alleged TILA violations, [First Amended Complaint at

¶¶ 120.(19), (20),] TILA preempts those claims.  See Kajitani v. Downey Sav. & Loan Ass'n, F.A., 647 F. Supp. 2d 1208, 1220 (D. Hawai`i 2008).  BOA is therefore entitled to summary judgment as to the portion of Count VI based on the alleged attempt to deprive Plaintiff of her right to cancel the loans.

Second, to the extent that Plaintiff bases her UDAP claim against BOA on allegations that Countrywide did not consider her ability to repay the loans or whether she qualified for a more favorable loan program, those claims also fail.  This district court has recognized that

> "lenders generally owe no duty to a borrower 'not to place borrowers in a loan even where there was a foreseeable risk borrowers would be unable to repay.'"  McCarty v. GCP Mgmt., LLC, 2010 WL 4812763, at *6 (D. Haw. Nov. 17, 2010) (quoting Champlaie v. BAC Home Loans Servicing, LP, 706 F. Supp. 2d 1029, 1061 (E.D. Cal. 2009)).  See also Sheets v. DHI Mortg. Co., 2009 WL 2171085, at *4 (E.D. Cal. July 20, 2009) (reasoning that no duty exists "for a lender 'to determine the borrower's ability to repay the loan. . . .  The lender's efforts to determine the creditworthiness and ability to repay by a borrower are for the lender's protection, not the borrower's.'" (quoting Renteria v. United States, 452 F. Supp. 2d 910, 922-23 (D. Ariz. 2006)).
>
> "[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money."  Nymark v. Heart Fed. Sav. & Loan Ass'n, 283 Cal. Rptr. 53, 56 (Cal. Ct. App. 1991).  Nothing in the Complaint indicates that any Defendant "exceed[ed] the scope of [a] conventional role as a mere lender of money."  The claims fail on that basis alone.

42

<u>Casino v. Bank of Am.</u>, Civil No. 10-00728 SOM/BMK, 2011 WL
1704100, at *12-13 (D. Hawai`i May 4, 2011) (alterations in
<u>Casino</u>).  Plaintiff's declaration stating that Robin Lefcourt,
who was working for Loan Network at the time, used to work at
Countrywide's Honolulu office and Ms. Lefcourt represented that
she could use her connections at Countrywide on Plaintiff's
behalf is not enough to create a genuine issue of material fact
as to whether Countrywide exceeded the scope of its conventional
role as a mere money lender.  Plaintiff has not presented any
evidence Countrywide actively participated in Plaintiff's
financial activity.  <u>See</u> <u>Nymark</u>, 283 Cal. Rptr. at 57 ("The
success of the [borrower's] investment is not a benefit of the
loan agreement which the [lender] is under a duty to
protect . . . .  Liability to a borrower for negligence arises
only when the lender actively participates in the financed
enterprise beyond the domain of the usual money lender."
(citations, quotation marks, and footnote omitted) (some
alterations in original)).  BOA is therefore entitled to summary
judgment as to the portion of Count VI based on the allegations
regarding Plaintiff's ability to repay and the structuring of
Plaintiff's loan program to obtain additional interest.

        The remainder of the allegations supporting Plaintiff's
UDAP claim against BOA assert that Countrywide misrepresented the
terms of Plaintiff's loans.  [First Amended Complaint at ¶¶

                                43

120.(3)-(18).] Even accepting, for purposes of the BOA Motion,
that Countrywide provided Plaintiff with the 1/2/07 Good Faith
Estimates, the documents that Plaintiff states she signed on
February 1, 2007 fully disclosed the terms of the loans.
Plaintiff states that, at the time she signed the documents, she
did not realize the terms were different from those in the 1/2/07
Good Faith Estimates because Ms. Yoza only presented her with
"the signature pages of various documents (some of which were
multiple page documents)" and she did not allow Plaintiff time to
review the documents. [Stanton BOA Decl. at ¶ 19.] In the
instant motion, it is not for the Court to weigh the credibility
of Plaintiff's testimony. See Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 ("Credibility determinations, the weighing of
the evidence, and the drawing of legitimate inferences from the
facts are jury functions, not those of a judge . . . ruling on a
motion for summary judgment."). Even if the Court assumes that
Plaintiff only saw the signature pages of the documents she
signed, among the documents that she signed were two Good Faith
Estimates dated January 31, 2007 ("1/31/07 Good Faith
Estimates"), each of which is a one-page document.

     The key terms of the loans, which Plaintiff alleges
Countrywide made false representations about or failed to
disclose, are set out in the 1/31/07 Good Faith Estimates:

• Instead of the conventional loans promised in the 1/2/07 Good
     Faith Estimates, the first loan is a "Payoption Arm" and the

44

second loan is a "HELOC".
- The estimated monthly principal and interest payment is $11,533.70 for the first loan and $10,480.22 for the second loan, not $4,840.67 and $1,289.03 as stated in the 1/2/07 Good Faith Estimates.
- The interest rate is 8.500% for the first loan and 10.625% for the second loan, not 6.50% and 6.00% as stated in the 1/2/07 Good Faith Estimates.
- The 1/31/07 Good Faith Estimates disclose the YSP paid to the mortgage broker.
- The term of the second loan is thirty years, not fifteen years as stated in the 1/2/07 Good Faith Estimate.
- The 1/31/07 Good Faith Estimate for the first loan includes the $488.00 appraisal fee and the $700 field/desk review appraisal fee, whereas the 1/2/07 Good Faith Estimate stated that the appraisal fee was $0.00.

[Pltf.'s BOA CSOF, Exhs. 1-2; BOA CSOF, Exhs. F-G.] Thus, even accepting Plaintiff's statement that she was only given the signature pages of documents to sign, Plaintiff could have, and should have, seen these terms, which are clearly set forth in the one-page 1/31/07 Good Faith Estimates. The only alleged failure to disclose in paragraph 120 of the First Amended Complaint that is not readily apparent from the applicable 1/31/07 Good Faith Estimate is Plaintiff's allegation that Countrywide "[f]ail[ed] to disclose that making the required payments in the First Loan would result in negative amortization." [First Amended Complaint at ¶ 120.(8).] The negative amortization of a loan is information that is important to consumers and is likely to affect their decision regarding a loan product. Viewing the evidence currently before the Court in the light most favorable to Plaintiff, this Court finds that there is a genuine issue of material fact as to whether a reasonable person would have been

mislead under the circumstances about the negative amortization
of the first loan. Plaintiff states in her declaration that she
would not have agreed to the loans if she had been aware of the
unfavorable terms in general. [Stanton BOA Decl. at ¶ 34.]
Viewing the evidence in the light most favorable to Plaintiff,
BOA has not carried its burden of establishing that it is
entitled to summary judgment on Plaintiff's UDAP claim based on
the failure to disclose the negative amortization in the first
loan.

    Plaintiff has not carried her burden of establishing
that there is a genuine issue of material fact that Countrywide's
alleged false representations and alleged failures to disclose
information in paragraphs 120.(3)-(7) and (9)-(18) were likely to
mislead reasonable consumers. This Court acknowledges that "the
application of an objective 'reasonable person' standard . . . is
ordinarily for the trier of fact, rendering summary judgment
'often inappropriate.'" Stanton, 2010 WL 4176375, at *11
(quoting Tokuhisa, 223 P.3d at 260). The Intermediate Court of
Appeals, however, noted in Tokuhisa that:

>           Reasonableness can only constitute a question of
>           law suitable for summary judgment when the facts
>           are undisputed and not fairly susceptible of
>           divergent inferences because [w]here, upon all the
>           evidence, but one inference may reasonably be
>           drawn, there is no issue for the jury. [A]
>           question of interpretation is not left to the
>           trier of fact where evidence is so clear that no
>           reasonable person would determine the issue in any
>           way but one.

122 Hawai`i 181, 195, 223 P.3d 246, 260 (quoting <u>Courbat v.</u>
<u>Dahana Ranch, Inc.</u>, 111 Hawai`i 254, 263, 141 P.3d 427, 436
(2006)) (alterations in original) (citations and internal
quotation marks omitted).  In the instant case, the contents of
the 1/31/07 Good Faith Estimates, one-page documents that
Plaintiff signed on February 1, 2007, are not disputed.  Further,
the contents of the 1/31/07 Good Faith Estimates are not
susceptible of divergent inferences.  This Court finds that there
is no triable issue of material fact as to these allegations
because no reasonable person would find that the relevant terms
set forth in the 1/31/07 Good Faith Estimates constituted
deceptive acts or practices.  BOA is therefore entitled to
summary judgment on Plaintiff's UDAP claim based on the
allegations in paragraphs 120.(3)-(7) and (9)-(18).

        The BOA Motion is DENIED as to the portion of Count VI
based on the alleged failure to disclose the negative
amortization in the first loan.  The BOA Motion is GRANTED as to
all other allegations in Count VI.

        D.    **<u>Fraud</u>**

        Count IX alleges a fraud claim against BOA based on
some of the same allegedly false representations that Countrywide
made about what the terms of the loans would be.  [First Amended
Complaint at ¶¶ 146-53.]

        Under Hawai`i law, the elements of a fraudulent or

intentional misrepresentation claim are: "(1) false representations made by the defendant; (2) with knowledge of their falsity (or without knowledge of their truth or falsity); (3) in contemplation of plaintiff's reliance upon them; and (4) plaintiff's detrimental reliance." <u>Miyashiro v. Roehrig, Roehrig, Wilson & Hara</u>, 122 Hawai`i 461, 482-483, 228 P.3d 341, 362-63 (Ct. App. 2010) (citing <u>Hawaii's Thousand Friends v. Anderson</u>, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989)). In order to support a finding of fraud, the plaintiff must establish these elements by clear and convincing evidence. <u>See, e.g.</u>, <u>Hawaii's Thousand Friends</u>, 70 Haw. at 286, 768 P.2d at 1301 (citation omitted).

Plaintiff asserts that, prior to closing, Countrywide made false representations about the terms of loans it was offering her. She further alleges that Countrywide: knew the representations were false or that it lacked knowledge of their truth or falsity; and made the false representations in contemplation of Plaintiff's reliance on them.

Under Hawai`i law, the false representation forming the basis of a fraud claim "must relate to a past or existing *material* fact and not the occurrence of a future event." <u>Joy A. McElroy, M.D., Inc. v. Maryl Group, Inc.</u>, 107 Hawai`i 423, 433, 114 P.3d 929, 939 (Ct. App. 2005) (citations and block quote format omitted) (emphasis in original). Further, even if the

48

allegations satisfy the other elements of a fraud claim, "[f]raud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and *an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events*[.]" Id. (citations and block quote format omitted) (emphasis in original). The exception to this general rule is that "[a] *promise relating to future action or conduct* will be actionable, however, if the promise was made without the present intent to fulfill the promise." Id. (citations and block quote format omitted) (emphasis in McElroy).

Even assuming that Countrywide, through Loan Network, provided Plaintiff with the 1/2/07 Good Faith Estimates, the representations about the proposed loan terms therein were merely promissory in nature or expressions of intention. Plaintiff cannot recover on a fraud claim based on the failure to fulfill those promises or intentions unless she can prove that, when Countrywide made those representations, it did not have the present intent to fulfill them. Plaintiff has not presented any evidence that would create a genuine issue of fact as to Countrywide's intent. BOA is therefore entitled to summary judgment on Plaintiff's fraud claim. The BOA Motion is GRANTED as to Count IX.

### E. Civil Conspiracy

49

Count XI, Plaintiff's civil conspiracy claim, alleges
that Countrywide, Loan Network, and Fidelity Escrow conspired to
accomplish the fraud upon Plaintiff alleged in Count IX and Count
X (the fraud claim against Loan Network). [First Amended
Complaint at ¶¶ 181-82.] Judge Ezra granted summary judgment in
favor of Fidelity Escrow, finding that Plaintiff had only
produced communications in the normal course of business between
Fidelity Escrow and Loan Network and that she had failed to prove
any facts showing that there was an illegal objective to those
communications. Stanton, 2010 WL 4176375, at *19.

As Judge Ezra stated in the 10/19/10 Summary Judgment
Order,

> "'the accepted definition of a conspiracy is a
> combination of two or more persons [or entities]
> by concerted action to accomplish a criminal or
> unlawful purpose, or to accomplish some purpose
> not in itself criminal or unlawful by criminal or
> unlawful means.'" Robert's Haw. Sch. Bus, Inc. v.
> Laupahoehoe Transp. Co., Inc., 982 P.2d 853, 881
> n.28 (Haw. 1999) (quoting Duplex Printing Press
> Co. v. Deering, 254 U.S. 443, 466 (1921))
> (alteration in original). The plaintiff must
> allege an underlying actionable claim because
> "there can be no civil claim based upon a
> conspiracy alone . . . ." Weinberg v. Mauch, 890
> P.2d 277, 286 (1995).
>   "A conspiracy is constituted by an agreement
> . . . No formal agreement between the parties is
> essential to the formation of the conspiracy, for
> the agreement may be shown if there be concert of
> action, all the parties working together
> understandingly, with a single design for the
> accomplishment of a common purpose." Marino v.
> United States, 91 F.2d 691, 694 (9th Cir. 1937);
>     The existence of the joint assent of the
>     parties need not be proved directly. Like

50

> any other ultimate fact, it may be found as
> an inference from facts proved.  It is enough
> if the evidentiary facts and
> circumstances-pieced together and considered
> as a whole-convince the judicial mind that
> the parties united in an understanding way to
> accomplish the fraudulent scheme.
>
> Kazuo Hashimoto v. Halm, NO. 2847, 1953 WL 7576,
> at *5 (Haw. Terr. Nov. 20, 1953); State v.
> Yoshida, 361 P.2d 1032, 1042 (1961) ("[t]he
> existence of a conspiracy may be inferred from the
> circumstances.").
>     In Vieux v. East Bay Regional Park Dist., 906
> F.2d 1330, 1343 (9th Cir. 1990), the Ninth Circuit
> upheld summary judgment in favor of defendants
> because plaintiff was unable to provide specific
> evidence that the defendants agreed among
> themselves to act against the plaintiff for an
> unlawful purpose.   Id.   In Vieux, the plaintiff's
> evidence of "correspondence or discussions"
> between the defendants was insufficient because no
> "illegal objective" was demonstrated.   Id.

Id. at *18-19 (some citations omitted) (alterations in original).

This Court has ruled that BOA is entitled to summary

judgment on Count IX.  Thus, Plaintiff's derivative conspiracy

claim can only be based on Count X, which alleges fraud by Loan

Network.  Even assuming that Loan Network committed fraud in its

representations to Plaintiff about the terms of the loans, in

order to prevail on her conspiracy claim against BOA, Plaintiff

must establish an agreement or an understanding between

Countrywide and Loan Network to accomplish Loan Network's

fraudulent scheme.  Plaintiff has only presented: the 1/2/07 Good

Faith Estimates that she states Loan Network provided her from

Countrywide; [Stanton BOA Decl. at ¶¶ 11, 13; Exhs. 1-2;] and her

declaration stating that Robin Lefcourt, Plaintiff's Loan Network
mortgage broker, represented that she used to work at Countrywide
and that "her connections would enable her to obtain a financing
'deal' even though Mr. Ramos had been unsuccessful in doing so"
[Stanton BOA Decl. at ¶ 7].

The production of good faith estimates by Countrywide
through Loan Network, as Judge Ezra noted regarding
communications between Loan Network and Fidelity, "involve[d] the
normal course of business regarding the transaction, and there
are no facts to show that there was an 'illegal objective' to
such communications." Stanton, 2010 WL 4176375, at *19.  Even if
Loan Network fraudulently represented the terms of the loans
Countrywide was offering Plaintiff, "'mere acquiescence or
knowledge is insufficient to constitute a conspiracy, absent
approval, cooperation or agreement.'"  Id. (quoting Robert's
Hawai`i, 982 P.2d at 889 n.44).

Further, Ms. Lefcourt's promise to use her connections
at Countrywide to obtain financing for Plaintiff does not
constitute evidence that Countrywide had an agreement or an
understanding to accomplish a fraudulent scheme with Loan
Network.  Even assuming that Ms. Lefcourt did in fact use her
contacts at Countrywide to obtain a loan where another Loan
Network mortgage broker had previously failed to do so, this does

not constitute evidence that Countrywide had an agreement or an understanding to accomplish a fraudulent scheme with Loan Network. Plaintiff has failed to establish a genuine issue of material fact as to her civil conspiracy claim against BOA. The BOA Motion is therefore GRANTED as to Count XI.

## F. **Aiding and Abetting**

Count XII alleges that Defendants aided and abetted each other in the wrongful acts alleged in Counts V through X. [First Amended Complaint at ¶¶ 185-88.] As to BOA, Plaintiff alleges that it is liable because "Countrywide aided and abetted Loan Network and/or Fidelity in connection with violating H.R.S. Chapter 480 or committing fraud." [Mem. in Opp. to BOA Motion at 38.] The Court notes that Plaintiff did not allege a fraud claim against Fidelity Escrow, and the only Chapter 480 claim remaining against Fidelity Escrow is the claim based on the failure to provide the Loan Documents to Plaintiff in a timely manner.

In the 10/19/10 Summary Judgment Order, Judge Ezra found that "Restatement (Second) of Torts § 876(b) and (c), as also elaborated upon by California case law, provides the appropriate law by which to assess" Plaintiff's aiding and abetting claim. Stanton, 2010 WL 4176375, at *15. The Restatement (Second) of Torts § 876 states, in pertinent part:

> For harm resulting to a third person from the
> tortious conduct of another, one is subject to

liability if he
. . . .
    (b) knows that the other's conduct
    constitutes a breach of duty and gives
    substantial assistance or encouragement to
    the other so to conduct himself, or
    (c) gives substantial assistance to the other
    in accomplishing a tortious result and his
    own conduct, separately considered,
    constitutes a breach of duty to the third
    person.

The 10/19/10 Summary Judgment Order also noted:

    As to the first test for aiding and abetting
    requiring knowledge that the other's alleged
    conduct constituted a breach of duty, the court in
    Casey v. U.S. Bank Nat'l Ass'n, 127 Cal. App. 4th
    1138, 1144 (2005) found that to satisfy the
    knowledge prong, the defendant must have "actual
    knowledge of the specific primary wrong the
    defendant substantially assisted." Id. at 406;
    see also Central Bank of Denver, N.A. [v. First
    Interstate Bank of Denver], 511 U.S. 164[, 181
    (1994)] (quoting the Restatement (Second) of Torts
    § 876(b)).

Stanton, 2010 WL 4176375, at *16. Judge Ezra noted that the

Hawai`i Supreme Court would likely agree with the actual

knowledge standard, based on its decision in In re Bishop,

Baldwin, Rewald, Dillingham & Wong, Inc., 69 Haw. 523, 751 P.2d

77 (1988), and the fact that Hawai`i courts generally look to

California law for guidance when there is no Hawai`i precedent on

a particular issue. Id. at *15-16. Judge Ezra's determination

of the standard applicable to Plaintiff's aiding and abetting

claim is the law of the case and, moreover, this Court agrees

with his analysis. This Court will therefore apply the same

standard to the instant motions.

As to the first test, Plaintiff contends that the same evidence that supports her civil conspiracy claim satisfies the knowledge prong.  This Court has already ruled that Plaintiff's evidence does not raise a genuine issue of material fact as to whether Countrywide had an agreement or an understanding to accomplish a fraudulent scheme with Loan Network.  Similarly, the Court also finds that the mere provision of good faith estimates and the fact that Ms. Lefcourt represented that she could use her contacts at Countrywide to secure a loan for Plaintiff do not raise a genuine issue of material fact that Countrywide had actual knowledge of Loan Network's alleged Chapter 480 violations and fraud.  Plaintiff also emphasizes that her provision of her financial information to Countrywide establishes that it had knowledge of her ability to pay.  As previously noted, however, lenders do not owe borrowers a duty to place them in a loan they can afford.  Countrywide's knowledge of Plaintiff's financial information and its provision of good faith estimates to Loan Network do not constitute evidence that Countrywide had actual knowledge of Loan Network's alleged Chapter 480 violations and fraud.  As to Fidelity Escrow, the only remaining UDAP claim against it is based upon the failure to provide the Loan Documents to Plaintiff in a timely manner.  Plaintiff has not presented any evidence that Countrywide had actual knowledge of Fidelity Escrow's failure to do so.  "[T]he actual knowledge

standard requires more than a vague suspicion of wrongdoing."
Countrywide "must have known more than that 'something fishy was
going on.'" See Stanton, 2010 WL 4176375, at *17 (quoting Casey,
127 Cal. App. 4th at 1149). Plaintiff has failed to raise a
genuine issue of material fact as to Countrywide's actual
knowledge of Loan Network's and Fidelity Escrow's alleged
wrongful conduct. Plaintiff does not have a triable aiding and
abetting claim under Restatement (Second) of Torts § 876(b). BOA
is entitled to summary judgment on Count XII to the extent that
the count relies on a theory that Countrywide knowingly provided
assistance to Loan Network and/or Fidelity in their alleged
commission of Chapter 480 violations or fraud.

        Restatement (Second) of Torts § 876(c), however, does
not require actual knowledge. Stanton, 2010 WL 4176375, at *17.
Viewing the evidence in the light most favorable to Plaintiff,
Countrywide failed to properly complete the forms notifying
Plaintiff of her right to cancel the loan transactions, as
required under TILA and Regulation Z. Countrywide also failed to
disclose the fact that the first loan included negative
amortization. Assuming, as Plaintiff has represented, that she
would have exercised her right to rescind if she had received
properly completed notices and that she would not have entered
into the loan in the first place if she had been aware of the
unfavorable terms, Countrywide's conduct constitutes a breach of

duty to Plaintiff that is separate from the alleged wrongful

actions by Loan Network and Fidelity Escrow that Countrywide

allegedly aided and abetted.  <u>See</u> <u>id.</u> (citing <u>Gonzales v. Lloyds</u>

<u>TSB Bank, PLC</u>, 532 F. Supp. 2d 1200, 1206 (C.D. Cal. 2006);

Restatement (Second) Torts § 876; <u>Casey</u>, 127 Cal. App. 4th at

1144).

     This Court next turns to whether Countrywide's alleged

actions gave "substantial assistance" to Loan Network and/or

Fidelity Escrow in accomplishing their alleged tortious results.

<u>See</u> Restatement (Second) of Torts § 876(c).  As noted in the

10/19/10 Summary Judgment Order:

> Restatement (Second) Torts § 876, comment on
> Clause (c) states:
>> When one personally participates in causing a
>> particular result in accordance with an
>> agreement with another, he is responsible for
>> the result of the united effort if his act,
>> considered by itself, constitutes a breach of
>> duty and is a substantial factor in causing
>> the result, irrespective of his knowledge
>> that his act or the act of the other is
>> tortious.
>
> Restatement (Second) Torts § 876, comment on
> Clause (c).  In discussing substantial assistance
> in the context of the first test for aiding and
> abetting, the comments to § 876 clarify that
>> If the encouragement or assistance is a
>> substantial factor in causing the resulting
>> tort, the one giving it is himself a
>> tortfeasor and is responsible for the
>> consequences of the other's act.  This is
>> true both when the act done is an intended
>> trespass . . . and when it is merely a
>> negligent act. . . .  The rule applies
>> whether or not the other knows his act is
>> tortious.
>
> Restatement (Second) Torts § 876, comment on

Clause (b).

<u>Stanton</u>, 2010 WL 4176375, at *17-18 (alterations in <u>Stanton</u>).

Viewing the facts in the light most favorable to Plaintiff, Countrywide's failure to properly complete the notice of right to cancel forms and its failure to disclose the negative amortization in the first loan could be construed as providing "substantial assistance" to Loan Network's and Fidelity Escrow's allegedly wrongful acts, notwithstanding Plaintiff's failure to insist that she be given time to read the documents at closing. <u>See</u> <u>id.</u> at *18 (denying summary judgment to Fidelity Escrow on the aiding and abetting claim). This Court therefore CONCLUDES that BOA has not established that it is entitled to summary judgment on Count XII to the extent that the count relies on a theory that Countrywide breached its duties to Plaintiff and that this breach provided substantial assistance to Loan Network and/or Fidelity in their alleged commission of Chapter 480 violations or fraud.

The BOA Motion is GRANTED as to Count XII to the extent that it relies on a theory that Countrywide knowingly provided assistance to Loan Network and/or Fidelity in their alleged commission of Chapter 480 violations or fraud. The BOA Motion is DENIED to the extent that Count XII relies on a theory that Countrywide breached its duties to Plaintiff and that this breach provided substantial assistance to Loan Network and/or Fidelity

58

in their alleged commission of Chapter 480 violations or fraud.

## II. __Fidelity Escrow's Motion__

After the 10/19/10 Summary Judgment Order, the remaining claims against Fidelity Escrow are Plaintiff's breach of fiduciary duty claim (Count XIV) and Plaintiff's UDAP claim (Count VIII) as to the alleged failure to provide the Loan Documents, and Plaintiff's aiding and abetting claim (Count XII). All of these claims are premised upon Judge Ezra's conclusion that "Fidelity Escrow owed a duty to Plaintiff to provide her the Loan documents at closing pursuant to the Lender's Closing Instructions." Stanton, 2010 WL 4176375, at *6. The Fidelity Escrow Motion essentially asks this Court to revisit Judge Ezra's ruling based on material facts that Fidelity Escrow contends have come to light since the 10/19/10 Summary Judgment Order. See supra pgs. 21-22 (citing Mem. in Supp. of Fidelity Escrow Motion at 3-4). This Court disagrees.

Plaintiff has stated, in both her declaration and in her deposition testimony, that she signed the Loan Documents on February 1, 2007 at Fidelity Escrow's office and that Dot Yoza presented the documents to her for her signature. [Stanton BOA Decl. at ¶¶ 18-19; Pltf.'s Fidelity Escrow CSOF, Decl. of Colin A. Yost, Exh. A (Trans. Excerpts of 2/9/11 Depo. of Plaintiff) at

2-6.[13]]  Although Fidelity Escrow has presented evidence to the
contrary, Plaintiff's testimony is enough to create a genuine
issue of fact as to where the signing took place and who provided
the documents to Plaintiff for her signature.  These issues are
relevant to the questions whether Fidelity Escrow was both the
signing agent and the settlement agent and what Fidelity Escrow's
obligations to Plaintiff were based on the closing instructions.
As noted previously, this Court cannot on summary judgment weigh
the evidence and determine these issues based on credibility.
This Court also finds that there is a genuine issue of fact as to
what Fidelity Escrow's obligations were based on the two versions
of the closing instructions.

        In spite of the progress of this litigation since the
10/19/10 Summary Judgment Order, there are still genuine issues
of material fact that preclude summary judgment in this case.
The Fidelity Escrow Motion is therefore DENIED.

### CONCLUSION

        On the basis of the foregoing, BOA's Motion for Summary
Judgment, filed June 15, 2011, is HEREBY GRANTED IN PART AND
DENIED IN PART.  Specifically, the BOA Motion is:

•DENIED as to Counts I through IV (TILA claims);
•DENIED as to the portion of Count VI (UDAP) based on the alleged
    failure to disclose the negative amortization in the first

_____

[13] These page numbers refer to the page numbers of the
exhibit because the pages numbers of the transcript itself are
obscured.

loan, and GRANTED as to all other allegations in Count VI;
- GRANTED as to Count IX (fraud);
- GRANTED as to Count XI (civil conspiracy); and
- DENIED as to the portion of Count XII that relies on a theory that Countrywide breached its duties to Plaintiff and that this breach provided substantial assistance to Loan Network and/or Fidelity in their alleged commission of Chapter 480 violations or fraud, and GRANTED in all other portions of Count XII.

Fidelity Escrow's Renewed Motion for Summary Judgment on Counts 8, 12, & 14 of Plaintiff's First Amended Complaint, filed June 15, 2011, is HEREBY DENIED in its entirety.

      IT IS SO ORDERED.

      DATED AT HONOLULU, HAWAII, November 30, 2011.



      /S/ Leslie E. Kobayashi
      Leslie E. Kobayashi
      United States District Judge

**CAROLYN ROSEMARY ESPINA STANTON V. BANK OF AMERICA, ET AL; CIVIL NO. 09-00404 LEK-BMK; ORDER GRANTING IN PART AND DENYING IN PART BANK OF AMERICA, N.A.'S MOTION FOR SUMMARY JUDGMENT AND DENYING FIDELITY ESCROW NATIONAL TITLE & ESCROW OF HAWAII, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNTS 8, 12, & 14 OF PLAINTIFF'S FIR5ST AMENDED COMPLAINT**